[No. D053080. Fourth Dist., Div. One. July 14, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ALLEN L. FIELDS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part III.A. and B.

**COUNSEL**

Chris Truax, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Gary W. Schons, Assistant Attorney General, Pamela Ratner Sobeck and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

In November 2006, the People filed a petition pursuant to the Sexually Violent Predators Act (SVPA or the Act) (Welf. & Inst. Code,[1] § 6600 et seq.) to commit Allen L. Fields to the State Department of Mental Health (the Department) for an indeterminate term of involuntary treatment. After a trial, a jury found that Fields was a sexually violent predator (SVP), and the court committed him to the Department for an indeterminate term.

On appeal, Fields contends that the SVPA, as amended in 2006, violates state and federal constitutional guarantees of equal protection and due process. He further claims that the trial court committed prejudicial error in limiting defense counsel's ability to question the People's expert witnesses with respect to the administration and results of a polygraph examination that was administered to Fields as part of his treatment.[2]

We reject Fields's constitutional claims. Further, we conclude that any error the court may have made in limiting defense counsel's questioning of the People's experts concerning the polygraph examination was harmless. We therefore affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 3, 2006, the People filed an amended petition seeking to recommit Fields as an SVP within the meaning of the SVPA.

Fields was convicted of molesting four boys, all under the age of 14. In 1983, Fields was convicted of two counts of committing a lewd act upon a

---

[1] Unless otherwise specified, subsequent statutory references are to the Welfare and Institutions Code.

[2] Although an SVPA proceeding is civil in nature (see *People v. Allen* (2008) 44 Cal.4th 843, 860 [80 Cal.Rptr.3d 183, 187 P.3d 1018]), we at times follow the common practice of characterizing the parties to the action as the "prosecution" and "defense," for ease of discussion. (See, e.g., *id.* at p. 866; *People v. Hurtado* (2002) 28 Cal.4th 1179, 1192 [124 Cal.Rptr.2d 186, 52 P.3d 116] ["Although the SVPA is a civil proceeding, its procedures have many of the trappings of a criminal proceeding."].)

child under the age of 14, for which he was sentenced to three years in prison. Fields molested two other boys in 1987. In 1988, after being charged with 93 counts of child molestation and possession of child pornography, Fields pleaded guilty to two counts of committing a lewd act upon a child under the age of 14, and two counts of committing forcible child molestation. Fields was sentenced to prison for 25 years.

During some of these crimes, Fields bound his victims, using restraints that were attached to Fields's bed. During his encounters with one of his victims, Fields would look toward some guns that were mounted on Fields's wall if the victim refused to participate in sexual acts with him. On one occasion, Fields fired a speargun through a piece of paper and said to the victim, "Imagine what that would do to you." At the time, Fields believed he was in love with that victim, and went so far as to name that victim as the beneficiary of his life insurance policy.

In 2003, Fields underwent a bilateral orchiectomy, or the surgical removal of his testes. Fields's family paid for the surgery. At trial, the parties placed significant focus on this fact and the question whether, after such surgery, it remained likely that Fields would engage in sexually violent criminal behavior if released.

Three mental health experts, Dr. Dawn Starr, Dr. Robert Owen and Dr. Doriann Hughes, all of whom are psychologists, testified for the People. Dr. Starr opined that Fields suffers from pedophilia, sexual sadism, and personality disorder with narcissistic and histrionic features. Dr. Owen testified that Fields suffers from "a severe case of pedophilia," and also from a personality disorder with narcissistic and dependent features. Both Drs. Starr and Owen testified that Fields is likely to engage in sexually violent predatory criminal behavior in the future if released. The doctors also questioned the validity of the few studies that have been done concerning physical castration and sexual offense recidivism.

Dr. Hughes treats sexual offenders, including Fields, at Coalinga State Hospital. Dr. Hughes had been meeting with Fields in group sessions twice weekly. Dr. Hughes described the sex offender treatment program in which Fields had been participating. The program consists of five progressive treatment stages called "phases." Dr. Hughes discussed Fields's treatment progress. She noted that he was currently in phase II, but that it was her opinion that Fields very recently became ready to move to phase III. Dr. Hughes testified that she felt "pretty strongly" that Fields needs to go through phase III of the treatment program before being released, because he "still has a long way to go working through some of these problem behaviors, high risks and characteristics that have been problematic for him in the past."

Fields testified in his own defense. He described being molested by his father when he was a child, and admitted that he had restrained his victims using soft restraints. Fields explained that he had voluntarily undergone surgery resulting in his physical castration. Fields stated that he no longer had deviant sexual fantasies or urges, and said that his behavior and thought patterns had changed since the time he molested his victims. Fields described his perception of his progress in treatment and explained that if released, he intended to move to Minnesota, where he would temporarily live with his sister and brother-in-law and would voluntarily continue outpatient treatment through Pathway Psychological Services.

Fields called Dr. Robert Halon, a psychologist, to testify as an expert witness for the defense. Dr. Halon testified that he did not believe that Fields posed a serious risk of reoffending, and opined that Fields did not meet the SVP standards. Specifically, according to Dr. Halon, there is a lack of evidence that Fields suffers from a "currently diagnosed mental disorder."

Dr. Mary Flavan, a psychiatrist, also testified for the defense. Dr. Flavan testified that she had spoken with Fields about chemical and physical castration while he was a patient at Atascadero State Hospital. Dr. Flavan had not conducted an evaluation of Fields prior to testifying. While she was working at Atascadero State Hospital and counseling sex offenders, Dr. Flavan compiled literature on the effectiveness of surgical castration on sexual offense recidivism. Dr. Flavan testified that physical castration is "very effective" at preventing recidivism in sexually violent offenders, and noted that some studies demonstrated a recidivism rate of between 1 and 3 percent. Dr. Flavan testified that in her opinion, a sexual offender with characteristics like Fields's who has undergone an orchiectomy should be released.

On May 2, 2008, a jury found Fields to be an SVP. The trial court ordered Fields committed to the Department for an indeterminate term.

III.

DISCUSSION

A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1001.

## C. *The polygraph examination*

Fields contends that the trial court abused its discretion in limiting defense counsel's cross-examination of the People's experts with regard to a polygraph examination that was administered to Fields as part of the treatment process in which he was voluntarily participating during his commitment.

### 1. *Additional background*

On April 22, 2008, during defense counsel's cross-examination of Dr. Starr, counsel asked, "Are you aware of whether or not Mr. Fields has undergone a polygraph examination at either Atascadero or Coalinga State Hospital?" Dr. Starr replied, "Yes, he did." The prosecutor immediately inquired of the trial court, "May we approach, Your Honor?"

Outside the presence of the jury, the prosecutor stated, "Your Honor, [defense counsel] wants to ask about the results of a polygraph exam. He is well aware that's not admissible, and I would object." Defense counsel responded, "I am not seeking to admit the results themselves. I am intending on asking the witness whether her—[(1)] [if] she is aware of my client having submitted to such an examination, and, [(2)], whether his having submitted to such an examination bears on her opinion." The following colloquy then occurred:

"[Prosecutor]: Your Honor, even the fact somebody takes a polygraph examination is not to be referred to in a court of law.

"The Court: In this state.

"[Prosecutor]: In this state, yes.

"[Defense counsel]: It's part of the treatment program, Judge. That's why they do it.

"The Court: This isn't a probation revocation case where someone is ordered to take a polygraph as a term and condition of probation so we could monitor their inner, secret thoughts.

"[Defense counsel]: But it is part of the treatment program in trying to ascertain whether an offender is making full disclosures of a number of victims, the nature of their offenses and whether they have otherwise complied with the treatment program itself.

"[Prosecutor]: My position, that's all . . . beside the point. It is not supposed to be referred to in a court of law and mention that anybody took it, or the results are not supposed to be mentioned.

"The Court: Do you have some case law that supports your position, [defense counsel], since I am not aware of one? Do you have a case?

"[Defense counsel]: I don't have a case handy.

"The Court: Well, handy or is there a case?

"[Defense counsel]: I don't know whether there is such a case.

"The Court: I see. [¶] . . . [¶]

"The Court: . . . [¶] We are still discussing the polygraph. The law is what the law is. And I am not aware of any case authority that allows the introduction of the polygraph issue in an S.V.P. case.

"[Defense counsel]: This may be the case that makes that law.

"The Court: I don't think so, so I will sustain the objection. I will instruct the jury to disregard the question."

The court thereafter instructed the jury to disregard "the last question and answer." Neither attorney asked Dr. Starr any further questions regarding the polygraph examination. Late in the day, the prosecutor called Dr. Owen to testify.

At the start of the proceedings the following day, outside of the presence of the jury, defense counsel moved to be permitted to ask the remaining experts about the polygraph examination. Defense counsel filed a document entitled, "Memorandum of Points and Authorities in Support of the Admission of Evidence [of] the Polygraph," and referred to a "Polygraph Examination Report" to inform the court about the three substantive questions Fields had been asked during his polygraph examination. The first question was, "Have you ever used a weapon to force a victim to engage in a sexual activity." Fields responded, "No." The second question was, "Do you have other victim profile types you have not disclosed since starting treatment?" Fields responded, "No." The third question was, "Have you had a deviant sexual fantasy since July of 2004?" Fields responded, "No." The polygraph examiner "found that Mr. Fields' polygraph charts did not display significant or unresolved physiological reactions to the relevant questions," and opined that Fields's answers were truthful.

Defense counsel noted that he was asking the court to allow him to inquire of Dr. Owen and of Fields about "the substance of this examination as reflected in the report," and as to "whether Mr. Fields submitted to a

polygraph examination as a prerequisite to entry into the Phase III program of the Sex Offender Commitment Program . . . ." Counsel argued that Fields's "submission to the examination was in compliance with the program requirements—and I think, therefore, is both relevant and probative."

The prosecutor objected, arguing that defense counsel had failed to "cite a case which stands for the proposition that a polygraph examination is admissible in a sexually violent predator case." The prosecutor also argued that defense counsel wanted the jurors to know that Fields had submitted to the polygraph examination in order to imply that Fields passed the examination, and this, the prosecutor contended, was "totally improper."

The trial court noted that the issue was one that would properly be the subject of an in limine motion, and that defense counsel had not filed such a motion. The court went on to state that evidence relating to polygraph examinations, including the results of those examinations, "are admissible in civil cases in California on some conditions . . . ." The court noted that if the parties stipulate to the admission of polygraph evidence, then such evidence may be admitted. Further, even in the absence of a stipulation, polygraph evidence may be admissible if "the party offering the polygraph is able to lay the foundation required by *Kelly-Frye* per scientific evidence" and if the court determines that the evidence is more probative than prejudicial pursuant to Evidence Code section 352. The court proceeded to recite the facts of a number of cases that involved the question of the admissibility of polygraph evidence.

After discussing these cases, the court noted that the law prohibits the use of polygraph evidence in criminal cases, but that it is not clear whether that evidentiary rule applies to polygraph evidence in the context of an SVP trial, which, according to the trial court, is considered a "quasi-civil" proceeding. The trial court stated, "It is an unknown question or there is no answer to the question, 'Are polygraphs allowed in a S.V.P. case?' There is no case law on that point."

Noting that Evidence Code section 351.1 "categorically prohibits polygraph evidence" in a criminal case, the trial court stated, "[A]bsent some case that says that a polygraph should be admissible in an S.V.P. proceeding, I am not going to allow it. In addition to that, and more fundamental, quite frankly, in the analysis of this issue is that we have had no testimony from Dr. Starr— we haven't finished with Dr. Owen, of course, but neither of the witnesses called by the People so far have testified they used the information of this polygraph examination to formulate their opinions."

The court expressed concern that "there has been no scientific acceptance of the reliability of the test, the polygraph test or the lie detector test for determining whether a subject is being truthful or not." The court then stated:

"If there was case law holding that the polygraph and the lie detector test was admissible, a holding that an S.V.P. is a strictly civil proceeding, is not a civil quasi [*sic*], slash, criminal proceeding, and you could properly bring a motion in limine to lay the foundation required by the *Kelly-Frye* test, and based on what was provided, the court then indicated you had met your burden under *Kelly-Frye*, then we go to the 352 analysis.

"And I can't speculate how I would rule on that because that's not before the court at this time. There is nothing to prohibit you from calling Mr. Fields to the stand and asking Mr. Fields, you know, . . . the three questions that were posed by the examiner."

Defense counsel eventually moved for an Evidence Code section 402 hearing as to Dr. Owen. The court said, "We can do that right now." Defense counsel then asked, "I understand the court's remarks to extend to results of the polygraph examination. Do[] the court's remarks also extend to the fact that Mr. Fields complied with program requirements in submitting to it?" The following colloquy then occurred:

"The Court: That's a different issue. I don't know—and I have done a lot of S.V.P. trials over the last ten years that I have been on the bench. I have never heard to the best of my recollection—sometimes I forget things or I have a failure of recollection, but I have never heard to the best of my recollection—[that there is a] requirement that someone submit to a polygraph test as a condition to go from one phase of the S.V.P. treatment program to another phase; I never heard of that before."

"[Defense counsel]: I understand Dr. Hughes has knowledge of that requirement.

"The Court: Dr. Hughes?

"[Defense counsel]: Dr. Doriann Hughes who [the prosecutor] intends on calling after Dr. Owen.

"The Court: Maybe he won't call Dr. Hughes now. I don't know. I don't know. I've never heard that before. I don't know.

"[Defense counsel]: Well, I think it appropriate—

"The Court: Did you have some written manual that indicates that a polygraph examination is required?

"[Defense counsel]: I don't know. I will look.

"The Court: On top of that, you remember you brought an in limine motion to the effect that you didn't want any information [that] your client ostensibly said in confidence to be used against him? This is an S.V.P. trial. You can't have it both ways.

"[Defense counsel]: Right, but we never reached that issue.

"The Court: Well, we did reach that issue. I said no.

"[Defense counsel]: Well, I still have a tactical decision with regard to disclosures, and I have made my tactical decision to this point.

"The Court: Okay. [¶] Let's conduct a 402 hearing as to Dr. Owen as to whether he used and formulated his opinion [with] the information that was gleaned from this polygraph examination, a lie detector examination. [¶] And, quite frankly, we don't have the person who did the examination here: We do not have a report as to the questions, the context, et cetera, and absent a videotape of that to verify, that's another issue that may come up."

The court then held a hearing pursuant to Evidence Code section 402. Defense counsel began the examination, and engaged in the following colloquy with Dr. Owen:

"Q. Among the records that you have reviewed concerning Mr. Fields in preparation for preparing reports in this matter, have you reviewed a polygraph examination report reflecting a polygraph examination administered at Atascadero State Hospital on August 10, 2005?

"A. Yes.

"Q. And did you consider the results of that examination in forming your opinion?

"A. I considered, but gave limited weight to the results.

"Q. And that consideration was part of the formation of your opinion in this case?

"A. Yes."

The prosecutor then began his questioning of Dr. Owen:

"[Prosecutor]: . . . Why did you give limited weight to the results?

"[Defense counsel]: Objection; relevance.

"[Prosecutor]: Okay.

"The Court: Relevance?

"[Defense counsel]: This is not a hearing to determine the weight that the expert gave to the examination report; it is to determine whether or not it was part of the materials he relied upon in forming his opinion.

"The Court: I disagree. You asked the question. You opened the door. Overruled.

"The Witness: I gave limited weight to it for a variety of reasons. [(1)], the polygraphs have not been shown to be reliable methods of assessing the truth. [(2)], the particular polygraph examination seemed to omit extremely important questions, such as were there any other victims. [¶] But primarily, it is a lack of reliability and validity with this instrument that gave me concern. Nonetheless, I considered it as I considered all documents in the file. But the question is, how much weight do I give to those particular documents or assessments? In this case, very limited."

Defense counsel then asked Dr. Owen whether he "g[a]ve consideration to the denial by Mr. Fields which was found truthful by the examiner that he did not have other victim types," to which Dr. Owen responded, "Yes." The prosecutor clarified with Dr. Owen that when he said that he " 'considered' " Fields's denial, he gave it "very limited weight" for the reasons he had already stated.

The court then heard argument from the attorneys. Defense counsel stated that he believed the "question ha[d] now shifted from one of admissibility to one of weight for the jury." The prosecutor disagreed, arguing that Dr. Owen had essentially said that he gave the results of Fields's polygraph examination no weight, and complaining that "the only purpose for doing this is to communicate to the jury he passed an exam, which is not scientifically reliable and they are hoping to rely on it."

The trial court ruled as follows: "My previous ruling remains the same. Again—and even Dr. Owen just testified, it is not reliable to assess the truth in an examination given, [and it] omitted a very important question as to

other victims. [¶] Again, there is no scientific acceptance of reliability for the test in determining whether a subject is being truthful or not. And that's consistent with the case law that has come down on that point. [¶] . . . [¶] . . . There has been no foundation laid under *Kelly-Frye* to where the court would obtain it [*sic*], if I were to assume this is a civil proceeding. The decision remains the same."

Defense counsel stated that he "wish[ed] to reserve reconsideration of the issue if [the prosecutor] calls Dr. Hughes to testify because I think Dr. Hughes is the only witness for the petitioner who has personal knowledge of the program requirements, and I remain interested in eliciting the operative fact that submission to a polygraph is a program requirement." After hearing from the prosecutor on this point, the court stated, "Based on what I have heard so far, I will deny [defense counsel's] motion. It is denied without prejudice. If he can pull a rabbit out of a hat somehow, we will see what happens." Neither attorney asked Dr. Owen about the polygraph examination.

The following morning, April 24, outside the presence of the jury, defense counsel raised the issue of another Evidence Code section 402 hearing regarding Dr. Hughes's ability to testify that Fields had completed a polygraph examination during his treatment. The following colloquy occurred:

"[Defense counsel]: I want a 402 hearing.

"The Court: As to who[m]?

"[Defense counsel]: Doriann Hughes, the petitioner's next witness.

"The Court: Why didn't you tell me yesterday afternoon?

"[Defense counsel]: I think I had told you yesterday morning that I wanted to revisit the issue of whether the polygraph examination was a condition of staffing for phase III through Doriann Hughes. [¶] . . . [¶]

"[Prosecutor]: All I can represent to Your Honor as far as whether we should have a 402 hearing—I will submit, Your Honor, on that issue. I honestly—I don't think that—my position hasn't changed, I will just tell you that. I think counsel can accomplish what he wants to accomplish if this helps you—apparently his goal is to let the jurors know that Mr. Fields is complying with departmental policies. That seems to be the whole purpose of it. The stated purpose is not to admit the results of the polygraph, although Dr. Hughes—I have asked her, yes, they have to take a polygraph in order to phase through, but that what Dr. Hughes is also prepared to testify under oath is that Dr. Hughes [*sic*] complies to [*sic*] all of the conditions.

"And I see her nodding 'yes.' That seems to be the goal he wants to bring before the jury, and it seems to me it can be accomplished that way.

"The Court: [Defense counsel]?

"[Defense counsel]: That is what I would intend to elicit at a 402, is that the polygraph is a mandatory condition of staffing for phase III and that Mr. Fields has complied with that condition, which I regard as an operative fact as I argued yesterday morning.

"The Court: I still don't follow your argument as to an operative fact, but we will hear from the doctor, the witness."

The court proceeded to hold an Evidence Code section 402 hearing during which Dr. Hughes discussed the use of a polygraph examination during the multiphase treatment process for SVP's. Specifically, Dr. Hughes stated that one of the requirements for an individual to "get from phase II to phase III" is to "submit to a polygraph." Dr. Hughes also clarified, however, that "[f]ailing a polygraph wouldn't preclude [an individual in treatment] from going over to phase III. There might be treatment issues that come[] from a failing of the polygraph, and it would be discussed with his phase providers and would be an issue during the staffing; however, it wouldn't necessarily prevent him from going on to phase III."

When asked whether she "personally rel[ies] on polygraphs, in general," Dr. Hughes stated, "I think it can be used as a treatment tool, but obviously there are problems with the polygraph and it is not supported through research. So it is a tool, but it is not something we heavily rely on." Dr. Hughes testified that she believed that Fields was presently ready to move to phase III of treatment.

When the attorneys and the court finished their questioning of Dr. Hughes, the court held a conference with counsel in chambers. The conference was not reported. After returning from the conference, the court stated on the record: "We are back in session in this matter. All parties are present, yet we are outside the presence of the jury panel, and Dr. Hughes is present. [¶] For the record, there was an unreported chambers conference with counsel, and I have decided to modify my previous ruling as to the polygraph issue. And counsel know what the court has indicated. Counsel can proceed accordingly."

The prosecutor elicited testimony from Dr. Hughes regarding the phases of the sex offender treatment program in general, as well as Fields's participation and progress in the treatment program. During cross-examination, defense counsel asked Dr. Hughes about the use of a polygraph examination in Fields's treatment:

"Q. . . . [¶] In regard to Mr. Fields being ready for the staffing panel to go into phase III, was he mandatorily required to submit to a polygraph examination?

"A. Yes, he was.

"Q. Did he, in fact, submit to one on or about August 10, 2005, at Atascadero State Hospital?

"A. I believe so. I don't know the date, but I know he did have one at Atascadero.

"Q. Fair enough. [¶] Was there anything about the result of the polygraph examination that prevented him from moving on to phase III?

"A. No."

Defense counsel then began asking Dr. Hughes about the amount and type of work required of individuals participating in phase II versus phase III. Neither attorney questioned Dr. Hughes any further on the issue of the polygraph examination.

During Fields's testimony, his attorney asked him the same questions that he had been asked during the polygraph examination:

"Q. Okay. Have you ever used a weapon to force a victim to engage in sexual activity?

"A. No.

"Q. Do you have any other victim profile types you have not disclosed since starting treatment?

"A. No.

"Q. Have you had a deviant sexual fantasy since July of 2004?

"A. No."

   2.  *Analysis*

Fields contends that the trial court should not have prevented him from cross-examining the state's experts about the extent to which they did or did not consider the results of the polygraph examination that was administered

to Fields. Fields complains that the trial court "refused to allow the defense to ask any of the experts about the specific questions, the answers given, and whether the test indicated those answers were truthful." Citing Evidence Code sections 801 and 802,[10] Fields contends that his attorney should have been permitted to ask the experts about their consideration of the polygraph examination results in forming their opinions.

■ " ' " 'Only relevant evidence is admissible [citations], and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. [Citations.] Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends " 'logically, naturally, and by reasonable inference' to establish material facts . . . . [Citations.]" [Citation.] The trial court has broad discretion in determining the relevance of evidence . . . .' " ' [Citation.]" (*People v. Richardson* (2008) 43 Cal.4th 959, 1000–1001 [77 Cal.Rptr.3d 163, 183 P.3d 1146] (*Richardson*).)

■ Pursuant to state law, polygraph evidence is not admissible in criminal proceedings or State Bar disciplinary proceedings, absent a stipulation by all parties. (Evid. Code, § 351.1, subd. (a)[11]; *Arden v. State Bar* (1987) 43 Cal.3d 713, 724 [239 Cal.Rptr. 68, 739 P.2d 1236] ["polygraph examination evidence is inadmissible in State Bar disciplinary proceedings in the absence

---

[10] *Evidence Code sections 801 and 802 refer to what an expert witness may testify to on direct examination. Evidence Code section 801 provides:*

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:

"(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and

"(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

Evidence Code section 802 provides: "A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion. The court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based."

[11] Evidence Code section 351.1, subdivision (a) provides: "Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court, unless all parties stipulate to the admission of such results."

of a stipulation between the attorney involved and the State Bar"].) However, Evidence Code section 351.1 does not speak to the use of polygraph evidence in proceedings outside the context of criminal proceedings, and we have found no statutory or judicially created bar to a party offering polygraph evidence in civil proceedings.

Proceedings under the SVPA are " 'civil commitment' proceedings [established] in order to provide 'treatment' to mentally disordered individuals who cannot control sexually violent criminal behavior." (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1171 [81 Cal.Rptr.2d 492, 969 P.2d 584].) Individuals who are eligible for commitment and treatment as SVP's "are to be viewed 'not as criminals, but as sick persons.' [Citations.]" (*Ibid.*) " '[A]n SVPA commitment proceeding is a special proceeding of a civil nature . . . .' " (*People v. Yartz* (2005) 37 Cal.4th 529, 532 [36 Cal.Rptr.3d 328, 123 P.3d 604].)     Evidence Code section 351.1 thus does not, by its terms, operate as a bar to the admission of polygraph evidence in SVP proceedings.

Under Evidence Code section 721, subdivision (a), "a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to (1) his or her qualifications, (2) the subject to which his or her expert testimony relates, and (3) *the matter upon which his or her opinion is based and the reasons for his or her opinion.*"[12] (Italics added.) "[C]ourts have traditionally given both parties wide latitude in the cross-examination of experts in order to test their credibility. [Citations.] Thus, a broader range of evidence may be properly used on cross-examination to test and diminish the weight to be given the expert opinion than is admissible on direct examination to fortify the opinion. [Citation.]" (*People v. Coleman* (1985) 38 Cal.3d 69, 92 [211 Cal.Rptr. 102, 695 P.2d 189].)

There appears to be at least a question as to whether the trial court improperly limited defense counsel's cross-examination based on the court's incorrect assumptions regarding the law applicable to the admissibility of

---

[12] Again, an expert witness's opinion testimony "is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801.) On direct examination, the expert may explain the reasons for his opinions, including the matters the expert considered in forming his or her opinions. (Evid. Code, § 802; see also *People v. Bell* (2007) 40 Cal.4th 582, 608 [54 Cal.Rptr.3d 453, 151 P.3d 292].)

polygraph evidence. In the particular circumstances of this case, however, we need not determine whether the trial court erred in preventing defense counsel from inquiring further of the prosecution's experts as to their consideration of the polygraph examination report in reaching their opinions about the likelihood that Fields would engage in sexually violent predatory behavior if released, because we conclude that there is no reasonable probability that the jury would have reached a different result if the court had permitted defense counsel to inquire further of the experts about the polygraph examination report.

"It is . . . well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice. [Citation.] '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citations.]" (*Richardson, supra*, 43 Cal.4th at p. 1001 [citing harmless error standard announced in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]].) In applying this prejudicial error standard, we conclude that there is no reasonable probability that Fields would have obtained a more favorable result if the court had permitted defense counsel to inquire further of the prosecution's experts regarding the substance of the polygraph examination report.

First, Fields's counsel was able to present, through other means, much of the information that jurors might have gleaned if defense counsel had been allowed to inquire about the polygraph examination. For example, Fields testified about these very matters at trial. Fields's attorney asked him the same questions that he was asked during the polygraph examination, and he gave the same responses. Thus, to the extent that Fields may have wanted to jury to know that he had not used weapons to force his victims to have sex with him, that he had no additional victim types, or that he had not had a deviant sexual fantasy since July of 2004, he was able to get that information in evidence through his testimony, albeit without the added value of the report's conclusion that these statements were "truthful."

Further, Fields's counsel would not have been able to use the substance of the polygraph examination in the way that Fields likely wanted to use it—that is, as proof that he was being truthful in stating that he had not used weapons in committing his crimes, that he did not have other victim types, and/or that he had not had any deviant fantasies between July 2004 and the time of the polygraph examination. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 619 [59 Cal.Rptr.2d 356, 927 P.2d 713] ["[A] witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible

matter into 'independent proof' of any fact. [Citations.]"].) Rather, counsel's use of the polygraph evidence would have been limited to helping the jury assess the weight to be given to the experts' opinions. However, the experts had already acknowledged that Fields's castration would have the effect of diminishing both his sex drive and his sexual fantasies. In fact, Dr. Starr acknowledged in her testimony that she believed Fields when he said that he had not had deviant sexual fantasies since his castration. However, she still believed that Fields was likely to commit further sexually violent predatory acts if released prior to completing all five stages of SVP treatment.

Fields also presented a large amount of evidence showing that his castration resulted in a decrease in his sex drive and his deviant sexual fantasies. Thus, the fact that a polygraph examiner concluded that Fields was being truthful in responding "no" to the question whether he had had a deviant sexual fantasy since his castration would not have provided the jury with any significant additional information.

Dr. Flavan described the effects of physical castration as follows:

"A. The principal effects of physical castration are de-sexualization or elimination of the sexual urge and sterilization because you can no longer make sperm.

"Q. What does 'de-sexualization' mean?

"A. Well, what goes first is ejaculation and then submission and then no longer being interested in actually having any sexual activities. That is de-sexualization. Sterilization, of course means no children."

Dr. Owen acknowledged that the orchiectomy was "a major protective factor," meaning that it was "something that would reduce [Fields's] level of risk of reoffending." Dr. Owen stated, "It is a good thing for him. It would make him safer in the community," and explained, "I think it is just common sense, though[,] that when you remove the testes from a man, that his sexual drive is going to go down substantially. That's what happened here. I certainly view it that way, that his risk of reoffending has gone down because of his surgery." Further, Fields testified about the relationship between his sex drive, his sexual fantasies, and his masturbation habits as follows:

"Q. And do you associate your sex drive with sexual fantasies?

"A. Absolutely.

"Q. What is the relationship in your mind?

"A. Without the sex drive, I don't have sexual fantasies. They are one in the same. I don't—If I am not masturbating, I don't have sexual fantasies. If I am having sexual fantasies, I am masturbating."

He later said, "If I am not masturbating—all of my deviant fantasies involve masturbation. Once my mastubatorial habits—once the Lupron[13] and castration were there, I no longer had any of my deviant fantasies. Since July, I guess it is of '03—I am pretty sure it was January, but I had agreed that July 1st was the start of it—I haven't had any fantasies that were deviant like that."

None of the experts challenged Fields's contention that he had not had any deviant sexual fantasies since his castration. As noted above, Dr. Starr stated that she believed Fields when he said that he was no longer having deviant sexual fantasies. For example, Dr. Starr testified: "So his account of his sex drive over time changes. [¶] So I'm not exactly clear where it is now, but at the present time, he is saying he has not had any deviant sexual interest or fantasies. And I think that in terms of his conscious awareness, I think that is true." Even the prosecutor acknowledged that castration would result in a reduction in one's sexual urges. During closing argument, the prosecutor said, "There is no doubt, obviously [an orchiectomy] does that [i.e., reduces testosterone levels], and reduces his sex drive. Do you need an expert to tell you that? That's obvious. It's clear."

The prosecution's experts addressed these issues and explained why, in their opinions, the lack of deviant sexual fantasies, and the fact that Fields had undergone the orchiectomy, were insufficient to convince them that Fields no longer posed a sexual threat to young boys. Fields's pedophilic disorder was unusual in that Fields became very attached to at least one of his victims, even falling in love with that victim. Further, Fields's inability to relate well with adults, which the experts noted was something that had not changed much during Fields's incarceration or commitment, made him more of a risk for repeating his past conduct if released. Dr. Owen explained: "Mr. Fields would be aroused at times and would ejaculate, having erections, showing the level of excitement these boys seemed to bring him. He was fixated on boys, couldn't relate very well with adults; he felt more comfortable with boys. He was essentially a boy lover and spent time with the boys and fell in love with the boy—with [R.] [¶] It is with extreme cases I see to actually fall in love with a boy like this. He would go through great manipulations to perpetrate his crimes. He would lie to people, deceive people, manipulate people to get access to the boys."

---

[13] Prior to undergoing the orchiectomy, Fields took the drug Lupron, which reduces one's testosterone level just as physical castration does.

Dr. Starr identified similar issues that continued to make Fields a risk for reoffending, despite the orchiectomy:

"The kinds of crimes he committed, he has described, involve[d] sadistic fantasies, fantasies of control or domination. These are not things that require testosterone. In fact, he also has talked about it was as much the relationship with these boys as it was the sexual part. [¶] So even though sex was a part of it, there are all these other facts that would continue to predispose him to trying to—and his continued poor interpersonal skills, while improving, he is going to have a hard time making friends out there on the streets. He has kind of a prickly personality. He will naturally feel more comfortable with young and needy boys. And that is a continued risk factor at this time. [¶] . . . [¶]

"Because he is having a relationship with these kids, thinking of them as peers or like as if they are on the same level, so that it is—it is not just the physical part. So lack of testosterone will not affect that."

Later, Dr. Starr said, "In his case, he has many of the same personality features and needs and problems that are contributory to his sexual offending: the need for attention, the neediness, the childlike demeanor, the lack of recognition of his internal conflicts and thought processes. All those things need to be controlled, all those things are still there, and those are high risk factors for him." Similarly, in responding to the prosecutor's question as to why it was his opinion that it would be necessary for Fields to remain in a secure facility to ensure the health and safety of others, Dr. Owen stated: "Well, we know what happened last time he left custody. Even though he was in treatment, he was committing sexual offenses. [¶] Things are different now in the sense he has had the orchiectomy, but he hasn't completed treatment to address the psychological elements of his sexual offenses. I think it is imperative he do [so]. I think it is imperative he finally face these demons that led to his sexual offending, that he look at his intimacy problems, he look at his high-risk factors, he develops good strategies to deal with all these. I think interrupting his treatment would be reckless and inappropriate. Despite the orchiectomy, I think he does pose a substantial risk of reoffending."

The experts also noted other reasons that Fields's orchiectomy would not prevent him from reoffending. For example, according to Dr. Starr, a lack of testosterone does not necessarily indicate a lack of sexual desire. When asked whether it was a fair to say that having "less testosterone" would make someone "less likely to be aroused sexually," Dr. Starr responded, "Right. But women don't have a high level of testosterone and they manage to be sexually aroused. You see animals that have been castrated; they show sexual behavior. In humans, it is not just a matter of having testosterone, it is a matter of what goes on up here (indicating), what we find sexually attractive,

what arouses us." Dr. Owen also testified to this effect, explaining: "There are so many psychological elements. This would be really easy if we believed sex was just based upon testosterone in the testes, and then I would say, 'He is good to go. That's it. The testes are gone. He should be out in the community.' [¶] But sex is not just a physical experience. It is psychological in so many ways, and there is a lot of research on this. And in this case, I think if we look at his experience with boys, we certainly see this, that first of all many of his sexual accounts did not involve ejaculation on his part. He is orally copulating these boys. He is fondling these boys. There is something sort of arousing just being with boys, having boys in his life, boys as companions, boys as a lover, boys are also sexual objects. So it just isn't testosterone."

Interestingly, out of a list of 69 risk factors that Fields viewed to be his personal risk factors, only six were "sexual in nature," while "all the rest [were] psychological." Further, Fields's crimes did not necessarily require that Fields be physically able to have an erection: "Most of the kinds of contacts he has with these children do[] not require an erection. Tying them up doesn't require an erection, orally copulating them wouldn't require an erection, or fondling; all of those things do not require [an erection]."

The evidence further demonstrated that even an individual who has undergone a physical castration can reverse the effects of the castration by taking testosterone. Dr. Starr noted this during her testimony: "So [castration] certainly does reduce people's sex drive and their preoccupations, at least according to the people who have had that. So I would say that is a significant factor that would help reduce his risk. On the other hand, and I do believe Mr. Fields at this point consciously doesn't believe[] he would, but . . . people can easily get over-the-counter testosterone and boost their testosterone level back if they so chose."

Dr. Owen expressed concern over the ease with which individuals can access testosterone. He explained, "Steroids, particularly testosterone, [are] pretty easy to get out in the community. You can go to a doctor and get a patch or injection that would give you testosterone." According to Dr. Owen, Fields might have a number of reasons for seeking out testosterone, and "it wouldn't be real difficult for [Fields] to go to any physician and get a prescription for testosterone," because "if he were out, there would be no mandatory supervision, no mandatory treatment, nothing that would prevent him from leaving here and going to any kind of walk-in clinic and getting a prescription." Even Dr. Flavan, who testified for the defense, acknowledged that the testosterone issue was significant in terms of the risk of reoffending after an orchiectomy. When defense counsel asked Dr. Flavan to explain the studies on castration and to discuss the success of castration in terms of

reducing recidivism in sexual offenders, Dr. Flavan said, "What this study discusses was that castration was extremely effective; however, there were two reoffenders and they were people who went to their doctor and said, 'May I please have some testosterone,' and the doctors said, 'Yes,' which was not good." It was thus clear to the jury that the mere fact that a sexual offender has undergone an orchiectomy does not necessarily eliminate all risk of reoffense.

The jury was also informed that Fields was aware that he could reverse some of the effects of the orchiectomy by taking testosterone. Defense counsel questioned Fields regarding the possibility of "reversing" the orchiectomy:

"Q. Well, you could reverse the orchiectomy with steroids, can't you?

"A. I can't really reverse the orchiectomy. You can only reverse the testosterone.

"Q. That would effectively restore your sex drive, wouldn't it?

"A. That's what they tell me."

Although Fields testified that he would not take testosterone if he were released, the jury was free to reject this testimony, particularly in light of Fields's failure to be honest about his intentions and his conduct after he was released from prison following his first conviction. Moreover, there was a great deal of evidence about Fields's various health complaints, the validity of which some of the doctors questioned. The jury could have reasonably inferred that Fields would have a number of opportunities to seek and obtain testosterone if released, and that he might be motivated to do so because of his predilection for engaging in relationships with young boys.

The speed with which the jury reached its verdict further convinces us that the jury would not have reached a more favorable result for Fields if Fields's attorney had been permitted to ask the experts about the polygraph examination. After hearing testimony for more than a week, the jury deliberated for less than two hours before finding Fields to be an SVP. The jury did not seem to have any difficulty reaching a decision as to Fields's dangerousness. Considering the minimal impact this additional evidence might have had relative to all of the other evidence that was presented to the jury, we cannot conclude that there is a reasonable probability that the jury would have reached a different result if it had known more about the results of the polygraph examination that was administered to Fields.

IV.

## DISPOSITION

The judgment of the trial court is affirmed.

Nares, Acting P. J., and Haller, J., concurred.