Filed 5/20/13  P. v. Caldera CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B240071 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA301745) |
| v. | |
| ARMANDO CALDERA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Lance I. Ito, Judge.  Reversed in part, affirmed in part, and remanded.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Zee Rodriguez and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Armando Caldera appeals from his conviction of three counts of special circumstance first degree murder, attempted premeditated murder, conspiracy to commit murder and unlawful taking of a motor vehicle.[1]  He contends:  (1) an incorrect jury instruction denied him a fair trial and due process; (2) it was prejudicial error to admit certain evidence; (3) imposition of a Penal Code section 186.22, subdivision (b)(1)(C) enhancement on each of the three murder convictions was error; and (4) the abstract of judgment does not correctly reflect the sentence imposed by the trial court.[2]  We strike the section 186.22, subdivision (b)(1)(C) enhancements on each of the three murder convictions and order the abstract of judgment modified to accurately reflect the sentence imposed by the trial court.  In all other respects, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Viewed in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358), the evidence established that in the summer of 2005, defendant, Ever, Angel Martinez and "Gonzo," were members of the East Los Angeles criminal street gang known as Lil Valley (LV).  LV's rival gangs included the Laguna Park Vikings (LPV), King Kobras (KK) and Krazy Ass Mexicans (KAM).  Murder victim Javier Castro was affiliated with KAM and murder victim Jovan Campos was affiliated with LPV.  Murder victim Sergio Garrido and attempted murder victim Raul T.

---

[1]	Defendant was charged by second amended information with three counts of special circumstance first degree murder (counts 1, 2 & 3) and attempted premeditated murder (count 4); he was jointly charged with Ever Starling Oropeza with conspiracy to commit murder (count 5) and unlawful driving of a motor vehicle (count 6); firearm use (§ 12022.53, subds. (b), (c), (d) & (e)(1)) and gang enhancements (§ 186.22, subd. (b)(1)(C)) were also alleged.  Following a separate jury trial, defendant was convicted as charged.  He was sentenced to multiple life terms, the details of which we set out in the body of the opinion.  Defendant timely appealed.

[2]	All future undesignated statutory references are to the Penal Code unless otherwise noted.

2

were not gang members.[3] The territory claimed by LV included the 400 block of Downey Road, where Javier and Sergio were killed on July 3. LPV claimed as its territory the 4000 block of Verona Street, where Jovan was killed and Raul wounded on August 10.

## A.    *Javier Castro and Sergio Garrido Murders*

Javier and Sergio lived next door to one another in the 400 block of Downey Road, respectively. Their front yards were separated by a short cinder block wall, and a short chain link fence separated Javier's property from the sidewalk. About a week before Javier and Sergio were fatally shot in their respective front yards on July 3, 2005, defendant and a taller man approached Javier and his pregnant girlfriend, Violeta G., as they were walking home. Javier identified defendant to Violeta, as "Little Malo from Lil Valley." In response to defendant's inquiry, Javier denied any gang affiliation. As defendant's companion lifted Javier's shirt looking for gang tattoos, Javier said, "Come on, man, we live just right here." Stating he did not care where they lived, defendant lifted up his shirt and put his hand on a gun tucked in his waistband. Violeta thought defendant was going to kill them, but defendant's companion told him not to do anything because Javier was with his pregnant girlfriend. Before walking away, defendant warned Javier, "I better not catch you slippn' in my varrio."

The confrontation was witnessed by Sergio's cousin Byron G., who was next door visiting. Byron could not hear what was being said, but from the body language of the participants he was afraid there was going to be a shooting.

At about 9:20 p.m. on July 3, Javier and Sergio were in their front yards talking to one another over the cinder block wall. When Sergio's mother, Petrona M., walked out onto the front porch to see if the taxi she was waiting for had arrived, she saw a tall, skinny masked man with his hand on a gun in his waistband staring at Sergio; the man

---

**3**    Because some of the victims and witnesses have the same last names, and some are minors, we refer to all witnesses by their first names.

3

took a few steps up the driveway and shot Sergio in the head, then fired at Sergio three more times. Petrona did not see a second man or anything happen to Javier.

Just before the shooting, Byron had been resting with his eyes closed in his truck parked in the driveway. Hearing gunshots, Byron opened his eyes and looked towards the sound. He saw Sergio standing in the front yard and the taller of two masked men fire a gun multiple times at Sergio. Although he could not see their faces, from their build Byron recognized the two masked men as the same two men he had seen arguing with Javier and Violeta the week before. From a photographic lineup, Byron identified defendant as one of the two men he saw confront Javier and Violeta the week before the shooting.[4]

The night of the shooting, Javier's girlfriend, Violeta was in her bedroom while Javier was outside talking to Sergio. At about 9:30 p.m., the sound of gunshots drew Violeta to the window. She saw Javier lying on the ground and the shorter of two men on the sidewalk side of the fence holding a gun. As Violeta ran out the front door toward Javier, she saw the shorter man lean over the fence and point the gun at Javier's head. Violeta said, "Please don't shoot him." Ignoring her plea, the man fired once and said, "This is for Lil Valley Puto." Violeta dropped onto the ground next to Javier. Looking up at the masked shooter, Violeta immediately recognized defendant by a scar on his eyebrow. Violeta identified defendant as the shooter from a photographic lineup. At trial, Violeta positively confirmed her identification. She thought defendant's taller companion at the time of the shooting was the same person she had seen with him during the confrontation a few days before, but she was not sure.

On August 14, 2005, a deputy sheriff searching a Honda parked in LV gang member Ever's carport, with Ever nearby, found a loaded Taurus model .357 magnum

---

[4]     Byron did not speak to the police that night because he was afraid to get involved. But three years later, in April 2008, Sergio's mother convinced him to tell the police what he had seen. It was in 2008 that Byron identified defendant from the photographic lineup.

revolver in the trunk.  Forensic analysis determined that this gun fired bullets recovered from Sergio's and Javier's bodies.

Defendant admitted to police having a confrontation with a KAM gang member and his pregnant girlfriend on Downey Road, but denied shooting anyone.

B.      *Jovan Campos Murder and Raul T. Attempted Murder*

About a month after Sergio and Javier were murdered, on August 10, 2005, at 3:00 p.m., Raul was walking home from Salazar Park where he had been playing basketball when he encountered his friend, Jovan.  As they were walking together, Jovan suddenly pushed Raul and told him to run.  Raul was running and hopping fences when he heard shots fired.  Jovan was shot six times and died in a driveway at the 4000 block of Verona Street.  Raul was shot twice; he never looked back to see who was shooting.

Laura M. stole cars for LV, which she knew were being used in driveby shootings. Laura occasionally saw defendant driving cars she had stolen.  A few days before the shooting, Laura stole Celeste S.'s gold Honda from in front of Celeste's home.  The morning of the shooting, Celeste's sister, Esther S., saw the car parked on the street not far from their home.  When defendant and another Hispanic man started to get into the car, Esther confronted defendant and demanded he give the car back.  Defendant told Esther to shut up and when she persisted he would "take care" of her, which Esther understood as a threat.  Defendant and his companion drove away in the stolen Honda. From a photographic lineup, Esther identified defendant as the person she saw drive away in the stolen Honda.  She confirmed her identification at defendant's preliminary hearing, but was unable to identify defendant at trial.[5]

At the time of the shooting, Tiffany C. was working in her front yard when she heard what she thought were fireworks.  Walking towards the street, Tiffany saw defendant get out of the front passenger seat of a silver or cream colored Honda parked in

---

[5]     The fingerprints of LV gang members Ever and Angel were found in the car. When interviewed by the police, defendant recalled the incident with Esther but denied that he knew the car was stolen.

the middle of Verona Street. Defendant ran down the street holding a black semiautomatic firearm and jumped a fence into a driveway at the 4000 block of Verona Street. Hearing two gunshots, Tiffany crouched down. When she got back up, Tiffany saw defendant run back to the car and the car speed away. Although defendant had been wearing dark sunglasses, Tiffany could clearly see his face from the nose down. Tiffany identified defendant as the person she saw running with a gun from a photographic lineup. She also identified defendant at his preliminary hearing and at trial. Tiffany was confident of her identification.

After school on the day Jovan and Raul were shot, Laura recalled hearing helicopters circling overhead while she was sitting on an apartment building porch with some friends. When LV gang member Ever rode up on a bicycle, Laura asked him if he knew what was going on. Ever smirked and said, "Just watch the news, you'll find out."

Police found multiple ejected .40-caliber shell casings at the scene of the shooting. All of the casings had been fired from the same weapon but no .40-caliber weapon was ever found. One of several bullets recovered from Jovan's body was also fired from a .40-caliber weapon but it was not possible to determine whether it had been fired from the same weapon that had fired the casings. In addition to the .40-caliber bullet, a .357-caliber bullet was recovered from Jovan's body. It was determined that this bullet, like the bullets recovered from Javier's and Sergio's bodies, was fired from the .357 magnum recovered by police from the trunk of the Honda parked in Ever's carport.

C. *Conspiracy to Commit Murder*

Sometime in August 2005, Laura (the car thief) was at Ever's house with defendant and Angel when she heard them talking about "regulating Laguna Park," which Laura understood to mean "payback." At the time, Angel was holding a revolver and Laura saw a shotgun in the room. On August 16, Laura drove defendant, Angel and a third person, Patricia, to the Big 5 in East Los Angeles in a stolen car for the purpose of buying ammunition. Laura waited in the car while the other three went into the store. When they came out, Angel was holding a bag of ammunition which he placed under the

driver's seat. No one told Laura what they intended to do with the ammunition, but she deduced that it was going to be used to "regulate" Laguna Park. Laura dropped defendant and Angel off at Gonzo's house and then went with Patricia to buy food and alcohol to bring back to the house. On the way back, police stopped Laura for a traffic violation. She was taken into custody after they found one box of .357-caliber ammunition and one box of .40-caliber ammunition in a Big 5 bag under the driver's seat. One bullet was missing from the box of fifty .357-caliber bullets.

Patricia testified she made the actual purchase with money given to her by Angel, who told Patricia they were going to go hunting.

Defendant admitted to the police that he went to Big 5 with Patricia and Angel, but denied the ammunition was his.

## DISCUSSION

### A.     *The Trial Court Correctly Instructed on Aiding and Abetting*

Without objection, the trial court gave CALJIC No. 3.00, which reads: "Persons who are involved in committing a crime are referred to as principals of that crime. Each principal, *regardless of the extent or manner of participation is equally guilty*. Principals include: 1. Those who directly and actively commit the act constituting the crime, or 2. Those who aid and abet the commission of the crime." (Italics added.) Defendant contends the italicized language is incorrect because an aider and abettor "is not 'equally guilty' but has a separate mens rea from that of the direct perpetrator." We agree with the People that defendant's failure to object to the challenged instruction constitutes a forfeiture of the claim. Even if defendant had preserved his claim, we would find no error. And even assuming error, we would find no prejudice.

#### 1.     Forfeiture

"[A]s a general proposition and in most cases, CALJIC No. 3.00 is a correct statement of the law." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 624 (*Mejia*).) For

7

this reason, a defendant who neither objects or requests clarification or modification of the "equally guilty" language in CALJIC No. 3.00, has forfeited his or her claim of error. (*Mejia*, at p. 624; see also *People v. Canizalez* (2011) 197 Cal.App.4th 832, 849 (*Canizalez*) [failure to object to "equally guilty" language in the 2009 version of CALCRIM No. 400, the analogue to CALJIC No. 3.00, constitutes forfeiture of the claim].)[6]

Here, without objection or request for clarification of the "equally guilty" language, the trial court gave CALJIC No. 3.00 (principals defined), as well as CALJIC Nos. 3.01 (aiding and abetting defined) and 3.02 (liability for natural and probable consequences).[7] Under *Mejia* and *Canizalez*, defendant has forfeited this claim of error.

### 2. No Error in Giving CALJIC No. 3.00

Even if defendant had preserved his contention for appeal, we would find no error. A trial court has a sua sponte duty to instruct on the general principles which are closely

---

[6] The 2010 version of CALCRIM No. 400 deleted the word "equally."

[7] During deliberations, the jury posed the following question: "Instruction regarding aiding and abetting in the Penal Code, do they extend to the degree of murder. If, for example, murder is deemed to be first degree, can the aider and abettor be convicted of second degree murder?" The parties and the trial court agreed to the following response: "The law of aiding and abetting applies to the degree of murder. An aider and abettor can be convicted of either first or second degree murder. [¶] Please refer to your instruction package concerning the difference between first and second degree murder." After some additional deliberation, the jury posed another question: "1. Instruction regarding aiding and abetting. [¶] Specifically as it applies to attempted murder, can one be convicted of attempted murder as an aider and abettor? [¶] The jury instructions 3.00, 3.02 suggest to some of us that the aiding and abetting statute only pertains to murder." Defense counsel suggested that the court simply answer that "aiding and abetting applies to attempted murder." The trial court decided to reinstruct with a modified CALJIC No. 3.02 which added the following italicized words: "In order to find the defendant guilty of the crime[] of murder *or attempted murder* under this theory . . . . [¶] 3. That a coprincipal in that crime committed the crime[] of murder *or attempted murder*; and [¶] 4. The crime[] of murder *or attempted murder* [was] a natural and probable consequence of . . . ."

8

and openly connected with the facts. We review de novo a claim that the trial court failed to do so. (*Canizalez, supra*, 197 Cal.App.4th at p. 850.)

In *People v. McCoy* (2001) 25 Cal.4th 1111, 1122 (*McCoy*), our Supreme Court held that one who aids and abets a killing may be found guilty of a greater offense than the direct perpetrator. In *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164 (*Samaniego*), the court held that this "leads inexorably to the further conclusion that an aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state." Therefore, the *Samaniego* court concluded, an instruction that an aider and abettor is "*equally guilty*" of the crime of which the perpetrator is guilty, "while generally correct in all but the most exceptional circumstances, is misleading here and should have been modified." (*Samaniego*, at pp. 1164-1165 [finding error harmless under *Chapman* standard].)[8]

In *Mejia*, *supra*, 211 Cal.App.4th at page 622, the court rejected a claim that, under *McCoy* and *Samaniego*, the "equally guilty" language in CALJIC No. 3.00 allowed the jury to convict the defendants of murder and attempted murder without first finding that each defendant acted with the requisite mens rea. In that case, Lorenzo was fatally shot as he and four fellow gang members (the four defendants) tried to break into the home of a rival gang member. The four defendants were convicted of Lorenzo's provocative act first degree murder and the attempted premeditated murder of the rival gang member into whose home they were trying to break. The court explained that by also giving CALJIC No. 3.01,[9] "the trial court effectively told the jury that to find appellants guilty, each must have been *aware* of Lorenzo's unlawful purpose and, through act or advice, *intentionally* promoted the accomplishment of that purpose. This

---

[8]     *Chapman v. California* (1967) 386 U.S. 18, 24.

[9]     CALJIC No. 3.01 reads: "A person aids and abets the commission of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice, aids, promotes, encourages or instigates the commission of the crime."

9

instruction advised the jury it must base its decision of each appellant's liability not simply on the mental state of the direct perpetrator of the crime, but on that appellant's state of mind and the extent to which he knew of and intended to facilitate the purpose contemplated by the perpetrator." (*Id*. at p. 625.)  The court also reasoned that the evidence showed that all four defendants and Lorenzo went to the location to kill the rival gang member and there was no evidence that any of them harbored a different state of mind.  (*Ibid*.)

Here, as in *Mejia*, the trial court gave CALJIC No. 3.01.  The evidence was overwhelming that defendant and the other gunmen harbored the same intent – to shoot and kill rival gang members.  There was no evidence from which it could reasonably be inferred that defendant harbored any different intent.  Under these circumstances, CALJIC No. 3.01 adequately clarified any ambiguity in CALJIC No. 3.00.[10]

We are not persuaded otherwise by defendant's argument that the testimony of Petrona (Sergio's mother) supports a finding that Javier's murder was an afterthought and therefore that defendant aided and abetted the first degree murder of Sergio, but only aided and abetted the second degree murder of Javier.  Petrona testified she saw a thin masked man, between 5'8" and 5'10" tall, shoot Sergio four times.  She did not see anyone else with the shooter and did not see what happened to Javier.  The deputy sheriff who interviewed Petrona the night of the shooting testified Petrona told him she saw masked man, between 5'8" and 5'10" tall, fire four times at Sergio, then flee north and fire two or three shots at Javier.  Whether Petrona was or was not mistaken about the identity of the shooter, nothing in her testimony or her statement to the deputy at the scene supports a finding that either killing was anything other than willful, deliberate and premeditated.

---

**10**    Defendant cites *People v. Loza* (2012) 207 Cal.App.4th 332, 348-357 for the proposition that failure to ask for modification of the "equally guilty" language constitutes ineffective assistance of counsel.  To the extent that this is intended as a contention that his counsel was ineffective for failing to object to CALJIC No. 3.00, we find no merit in the contention.  (*Samaniego, supra*, 172 Cal.App.4th at p. 1170 [no ineffective assistance of counsel in failing to object to correct jury instruction].)

10

3.     Harmless Error

Even assuming CALJIC No. 3.00 was misleading under the circumstances of this case, which we do not believe it was, any error in giving it was harmless beyond a reasonable doubt given the overwhelming evidence defendant's intent was to shoot and kill rival gang members.  (*Mejia, supra*, 211 Cal.App.4th at p. 625.)

A.     *No Abuse of Discretion in Admitting Challenged Evidence*

Defendant contends it was an abuse of discretion for the trial court to allow the prosecutor to introduce into evidence, over defense objection, (1) a photograph taken by police of defendant wearing a black beanie found in the search of Ever's residence and (2) an LV tattoo defendant obtained five years after the murders occurred.  He argues this evidence was irrelevant and more prejudicial than probative under Evidence Code section 352.  We disagree.

With certain statutory exceptions, all relevant evidence is admissible.  (Evid. Code, § 351.)  " 'Relevant evidence' means evidence. . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.)  The test is whether the evidence tends " ' "logically, naturally, and by reasonable inference" ' " to establish material facts.  (*People v. Fields* (2009) 175 Cal.App.4th 1001, 1016.)  Circumstantial evidence is evidence from which a fact may be inferred.  (*People v. Nealy* (1991) 228 Cal.App.3d 447, 451.)  "An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action."  (§ 600, subd. (b).)

However, even relevant evidence may be excluded if its probative value is substantially outweighed by concerns of undue prejudice.  (Evid. Code, § 352.) " ' "Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent.  The ability to do so is what makes evidence relevant . . . .  ' "The 'prejudice' referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against

11

[a party] as an individual and which has very little effect on the issues.  In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " . . .' . . . [¶]  The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to [a theory of prosecution or defense] that naturally flows from relevant, highly probative evidence." . . . "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors. . . ." . . .' . . .  In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." . . .' . . ." (*People v. Scott* (2011) 52 Cal.4th 452, 490-491 (*Scott*), citations omitted.)

We review a trial court's ruling on the admissibility of evidence, including under Evidence Code section 352, for abuse of discretion.  (*Scott*, *supra*, 52 Cal.4th at p. 491.)

1.     The LV Tattoo

In *People v. Ochoa* (2001) 26 Cal.4th 398, 438 (disapproved on another ground in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14), our Supreme Court held the fact the defendant had "187" tattooed on his forehead after the charged murder was committed, was admissible because it "represented an admission of defendant's conduct and a manifestation of his consciousness of guilt."

Here, defendant objected to admission of a photograph of the left side of defendant's face showing an "LV" tattoo that defendant obtained several years after the charged crimes.  He argued there was extensive evidence of defendant's gang membership at the time of the charged crimes and the fact he got a gang tattoo five years later was not probative.  The trial court overruled the objection, reasoning evidence of defendant's continued commitment to the gang was relevant to the gang special circumstances and gang enhancement.  We find no abuse of discretion.  The fact defendant had LV tattooed on the side of his face five years after the charged crimes

12

occurred is circumstantial evidence having a tendency in reason to show the level of his commitment to the gang, which in turn shows motive for the murders and attempted murder. It is also probative of the gang special circumstance and gang enhancements. Nor was evidence of the LV tattoo particularly inflammatory. Under these circumstances, it was not an abuse of discretion to admit this evidence.

2.      Photograph of Defendant Wearing a Ski Mask

In June 2005 – one month before the murders – deputies executing a search warrant at Ever's home encountered defendant wearing a black ski mask as a beanie. In addition to photographing defendant's tattoos, the police directed defendant to pull down the beanie over his face so that it served as a ski mask and photographed defendant wearing the ski mask in this fashion. Although police confiscated the ski mask, it was subsequently destroyed because it was not relevant to the unrelated case against Ever in which it was confiscated. Defendant sought to exclude the photograph on relevance and Evidence Code section 352 grounds because the ski mask was not the one defendant was alleged to have been wearing at the time of the charged crimes. The prosecutor countered the photograph was relevant to show the scar on defendant's eyebrow was visible through the eye hole of a generic ski mask. The trial court admitted the photograph, reasoning: "It's relevant for two reasons: one, people don't normally wear beanie caps in July because of the weather; and, two, it does show he has knowledge of a ski mask. You don't -- by beanie, ski mask, I mean, mistaking it as a ski mask or vice versa. [¶] Also, it does show the eyes -- eye opening of the particular ski mask would show. So I find under [section] 352 that its probative value is substantial." We find no error.

Violeta testified she recognized defendant through the ski mask because she could see the scar on his eyebrow. Thus, whether defendant's eyebrow scar was visible through the eyehole of a ski mask was relevant to the issue of identification. There was no evidence that either the ski mask the shooter was wearing or the ski mask defendant was wearing in the photograph were unique in any way that would suggest the photograph was not probative of how defendant's eyes would look in a generic ski mask. Under

13

these circumstances, it was not an abuse of discretion to admit the photograph into evidence. Nor is there anything unduly prejudicial about the photograph. For these reasons, it was not an abuse of discretion to admit this evidence.

*B.      Sentencing Errors*

1.      Counts 1, 2 and 3

On each of the three murder convictions (counts 1, 2 & 3), defendant was sentenced to consecutive terms of life in prison without the possibility of parole for special circumstance murder, plus a consecutive 25 years to life for the section 12022.53, subdivision (d) firearm enhancement, plus a consecutive 10 years for the section 186.22, subdivision (b)(1)(C) gang enhancement. Defendant contends it was error to impose the 10-year enhancements because section 186.22, subdivision (b)(1)(C) is inapplicable to a term of life without the possibility of parole. We agree.

Section 186.22, subdivision (a) establishes a substantive offense for participation in a criminal street gang. Subdivision (b)(1) of that section establishes enhancements for commission of a crime for the benefit of a criminal street gang "[e]xcept as provided in paragraphs (4) and (5)." Paragraphs (4) and (5) of section 186.22, subdivision (b) provide alternate penalties, not enhancements, for specified crimes committed for the benefit of a criminal street gang. (See *People v. Campos* (2011) 196 Cal.App.4th 438, 448 [§ 186.22, subd. (b)(5) is an alternate penalty, not an enhancement].) Section 186.22, subdivision (b)(5) reads: "Except as provided in paragraph (4) [enumerating specified crimes], any person who violates this subdivision *in the commission of a felony punishable by imprisonment in the state prison for life* shall not be paroled until a minimum of 15 calendar years have been served." (Italics added.)

In *People v. Lopez* (2005) 34 Cal.4th 1002, 1004 (*Lopez*), the court held a section 186.22, subdivision (b)(1)(C) enhancement cannot be imposed on a felony that is punishable by life in prison. Instead, section 186.22, subdivision (b)(5) applies to such a felon because that paragraph expressly applies to "*any* person who violates this

14

subdivision in the commission of a felony punishable by imprisonment in the state prison for life . . . ." (Italics added.) The *Lopez* court rejected any distinction between straight life terms (i.e., seven years of incarceration before parole eligibility (§ 3046)) and terms of years to life. (*Lopez,* at pp. 1010-1011.) It held subdivision (b)(5) applies even when it will have no practicable effect, such as where an underlying first degree murder conviction has a minimum parole eligibility of 25 years, greater than the 15 years prescribed by section 186.22, subdivision (b)(5). (*Lopez,* at pp. 1008-1009.) We can discern no reason to apply a different rule when the underlying offense is punishable by life without possibility of parole.

In examining the legislative history of section 186.22, the *Lopez* court commented that the predecessor to section 186.22, subdivision (b)(5) (i.e., former § 186.22, subd. (b)(3)) was understood to apply to all lifers, "*except those sentenced to life without the possibility of parole. . . .*" (*Lopez, supra,* 34 Cal.4th at p. 1010, italics added.) Relying on this dicta in *Lopez,* the People argue that the section 186.22, subdivision (b)(5) does not apply to those sentenced to life without the possibility of parole; rather, the section 186.22, subdivision (b)(1)(C) 10-year enhancement should apply to that sentence. But since the defendant in *Lopez* had been sentenced to 25 years to life for murder, the court was not called upon to rule on the applicability of section 186.22, subdivision (b)(1) and (5) to a term of life without the possibility of parole. Since *Lopez,* no published case has addressed the issue. Given the clear language of the statute, we conclude the 10-year enhancement does not apply.

Because defendant was sentenced to life without the possibility of parole on each of the three special circumstance murder convictions, the section 186.22, subdivision (b)(1)(C) enhancement is inapplicable. We therefore strike those enhancements.

2.    Count 4

For attempted premeditated murder (count 4) defendant was sentenced to 15 years to life in prison, plus a consecutive 25 years to life pursuant to section 12022.53, subdivision (d), to run consecutively to the life terms imposed on the murder convictions

(counts 1, 2 & 3). The abstract of judgment correctly reflects the 15-year-to-life term and the section 12022.53, subdivision (d) enhancement, but incorrectly reflects imposition of a 10-year section 186.22, subdivision (b)(1)(C) enhancement. The parties agree that the abstract of judgment should be corrected to reflect the sentence actually imposed by the trial court. We agree and order the abstract corrected.

## DISPOSITION

The 10-year section 186.22, subdivision (b)(1)(C) enhancements for counts 1, 2 and 3 are stricken. The matter is remanded to the trial court with directions to prepare an amended abstract of judgment to reflect this modification and to correctly reflect the sentence imposed on count 4 by deleting the section 186.22, subdivision (b)(1)(C) enhancement. The trial court shall forward to the Department of Corrections and Rehabilitation a certified copy of the amended abstract of judgment. In all other respects, the judgment is affirmed.

RUBIN, ACTING P. J.

WE CONCUR:

FLIER, J.

GRIMES, J.

16