Filed 6/21/16  P. v. Jackson CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

<table>
<tr><td>

THE PEOPLE,

     Plaintiff and Respondent,

v.

MELVIN LEE JACKSON,

     Defendant and Appellant.

</td><td>

A139183

(Alameda County
Super. Ct. No. C139531)

</td></tr>
</table>

Melvin Lee Jackson appeals from the trial court order for recommitment to the Department of State Hospitals[1] pursuant to a jury verdict that he is a sexually violent predator (SVP) within the meaning of the Sexually Violent Predators Act (Welf. & Inst. Code,[2] § 6600 et seq. (SVPA or the Act)).  He contends reversal is required due to numerous evidentiary and instructional errors that deprived him of his due process right to a fair trial.  He also maintains there was insufficient evidence that he is an SVP. Further, he claims that the SPVA is unconstitutionally vague.  Finally, he contends that the amended SVPA, providing for an indeterminate term of commitment, violates the equal protection and ex post facto clauses.  We affirm the commitment order.

## I.  BACKGROUND

Appellant was first committed to the custody of the Department of Mental Health (DMH) on October 16, 1998.  We affirmed the order of commitment in an unpublished

---

[1]    As of July 2012, the Department of Mental Health became the Department of State Hospitals.  (See Stats. 2012, ch. 24, § 139, p. 1033–1034.)

[2]    All undesignated statutory references are to the Welfare and Institutions Code.

1

opinion.  (*People v. Jackson* (Feb. 17, 2000, A084974) [*Jackson I*].)  On September 20, 2000, the Alameda County District Attorney petitioned for recommitment pursuant to section 6604.  (*People v. Jackson* (Aug. 12, 2002, A096066) [*Jackson II*].)  The court ordered recommitment for an additional two years commencing October 16, 2000. (*Ibid.*)  This court affirmed the order of the recommitment in an unpublished opinion. (*Ibid.*)  In July 2002, the Alameda County District Attorney petitioned for recommitment. Due to trial court delays the recommitment time was about to expire.  Consequently, in August 2004, the district attorney filed a *third* petition to recommit for the period October 16, 2004 through October 15, 2006, and moved successfully to consolidate the two recommitment trials.  (*People v. Jackson* (Sept. 28, 2006, A111971) [*Jackson III*].) A jury found appellant to be an SVP and the court ordered his commitment extended to October 16, 2006.  (*Ibid.*)  We affirmed the order of recommitment in an unpublished opinion.  (*Ibid.*)  In a petition filed on August 17, 2006, and amended on August 24, 2007, the Alameda County District Attorney once again petitioned for recommitment. Due to various delays, continuances, and pretrial proceedings, the matter did not proceed to trial until May of 2013.  Following a three-week trial, the jury found appellant to be an SVP and the trial court committed appellant to the Department of State Hospitals (DSH) for an indeterminate term.  The instant appeal followed.

## II.  EVIDENCE AT TRIAL

### A.  State Case

#### 1.  Experts

The prosecution presented expert witness testimony from two psychologists, who both opined that appellant qualified as an SVP.

##### a. Dr. Jack Vognsen

Psychologist Jack Vognsen testified that appellant qualified as an SVP.  Dr. Vognsen based his opinion on several factors, including his interview of appellant, institutional and court record review, results of various risk assessment instruments, as well as the past evaluations by psychologists Dr. Amy Phoenix and Dr. David Stubbins.

As part of his testimony, Dr. Vognsen provided the details of appellant's criminal history, including five sexual offenses, three of which qualified as predicate offenses. That testimony is as follows: On October 12, 1977, appellant entered the home of Pamela A., threatened her with a knife, choked her, forced her to orally copulate him, and ejaculated in her mouth. He tried to rape her, but could not achieve an erection. He was arrested as he was leaving the house. He had been out on parole for only a month and a half when the offense occurred. Appellant was convicted of burglary and oral copulation for the offense against Pamela A. and was sentenced to prison.

Appellant was paroled for the offense against Pamela A. on October 15, 1981. Less than a month later, on November 6 of the same year, appellant entered the home of Lisa S., confronted her with a knife, tied her up, raped her and forced her to orally copulate him, and then stole some money from her purse.

On December 9, 1981, appellant pushed his way into Jeannie G.'s home after she responded to the doorbell, pulled her clothes off, punched her, and pointed something sharp which he said was a knife into her back. After tying her hands behind her back and blindfolding her, he forced her to orally copulate him and raped her. This offense was dismissed as part of a plea bargain.

On January 14, 1982, appellant surprised victim Paula R. when she entered her house, putting a hand over her face and trying to push her against the floor. After a struggle, she broke free and ran out the front door. Appellant fled. A knife was later found on Paula's bed.

On February 11, 1982, appellant escaped from jail. On February 24, 1982, he broke into Joanne F.'s home and hid in a closet, jumping out and surprising her when she returned home. As she struggled, appellant punched her in the face and said, " 'Quit screaming bitch or I'll kill your baby.' "

After tying her hands and blindfolding her, he raped the victim and unsuccessfully attempted to have anal intercourse with her. Before fleeing, he stole money from her.

Dr. Vognsen opined that the nature of appellant's offenses indicates that appellant was "actively seeking a non-consenting" sexual experience when committing his crimes.

Dr. Vognsen contrasted appellant's behavior with a "common rapist" who commits one or two offenses but "seems to learn something from it, that it's not all what he thought it was going to be, and does not do it again." Dr. Vognsen further explained that appellant did not feel the "normal inhibitory responses," such as "a woman's tears [that] will desexualize a man, will cause him to lose his erection," and he also did not gain insight from his prison incarceration for these offenses.

Dr. Vognsen also testified that appellant had several nonsexual offenses as a youth, resulting in his commitment to the California Youth Authority on four occasions, that he also had several rules violations while in prison and at the state hospital.

Dr. Vognsen diagnosed appellant with two mental disorders—paraphilia not otherwise specified (NOS) and antisocial personality disorder. Dr. Vognsen explained that although appellant had not acted out sexually in several years, he opined that appellant's disorders were current because they were lifelong disorders, and appellant had been under heavy supervision in prison and at the state hospital, making it difficult for him to reoffend. Dr. Vognsen said a paraphilia NOS diagnosis requires "indications" of "fantasies, urges or behaviors towards nonconsenting others" over at least a six-month period and, in appellant's case, the evidence spanned four to five years.

Dr. Vognsen noted that appellant began the treatment program at Coalinga State Hospital (CSH) in 2008, but dropped out and then returned in 2009. Although Dr. Vognsen noted that the most recent evidence indicates that appellant had been doing well in that program, he was concerned about the drop-out aspect and appellant's initial lack of compliance with program requirements. Dr. Vognsen explained that appellant was halfway through the third phase of the five phase treatment plan, has done all the "homework," but refused any diagnostic testing about whether "he still has . . . fantasies about rape." Dr. Vognsen opined that this refusal suggested that appellant was "covering up something."

Dr. Vognsen opined that appellant was likely to reoffend in a sexually predatory manner if released. He based his opinion on two actuarial instruments, the Static-99R and the Static-2002 Revised (Static 2002R), and two clinical tools, the Sexual Violence

Risk 20 and the Structured Risk Assessment Forensic Version, and several dynamic factors. In Dr. Vognsen's opinion, appellant had over a 50 percent chance of committing a new sexual offense within 10 years if released. He further opined that appellant was not a good candidate for outpatient treatment.

### b. Dr. Dawn Starr

Psychologist Dawn Starr testified as a second expert for the People. In her opinion, appellant qualified as an SVP. Dr. Starr diagnosed appellant with paraphilia NOS and antisocial personality disorder. Like Dr. Vognsen, she opined that appellant was likely to reoffend in a sexually violent predatory manner if released based on his Static-99R and Static-2002R scores. Dr. Starr noted that to his credit, appellant had begun participating in sex offender treatment. However, his attendance was inconsistent and he had dropped out twice since enrolling in 2008. He had also refused to participate in two assessment tests. Appellant told Dr. Starr that one of the tests involved showing pictures of consensual and nonconsensual acts, and that if they showed slides oriented toward his crimes, he was concerned that his response would be "predictable." Dr. Starr explained that she did not believe appellant would be a good candidate for outpatient treatment because his attendance and participation even in the hospital was inconsistent; he picked and chose what he wanted to participate in; his cooperation with supervision out of custody in the past had been poor; he continued to lack insight into his behavior; and he himself was concerned about being sexually aroused by deviant material. Dr. Starr noted that she thought that appellant was "genuinely . . . trying to improve himself . . . ." However, she added that "he still had this anger and rage that kind of breaks through and he disproportionately reacts."

### 2. *Other Psychological Evidence*

#### a. Dr. Tricia Busby

At the time of trial, psychologist Tricia Busby had worked for six years at CSH as a behavioral specialist. She had a doctoral degree in forensic psychology and was working toward a clinical psychologist license. At CSH, she conducted assessments and facilitated group and individual treatment programs, supervised by two licensed staff

5

psychologists.  She prepared "diagnostic clarifications," which comprised the assessment portion of the Sex Offender Treatment Program (SOTP).

Appellant had participated in some self-report assessments and in two assessment tools administered by Dr. Busby.  Dr. Busby further discussed her results on the Multiphasic Sex Inventory Two.  The 560 questions in that instrument told Busby that appellant was "minimizing the planning strategies he used to set up his offense behavior and minimizes the feelings of anticipation and excitement he had leading up to the offense behavior."  Appellant scored 30 out of 50 as to "antisocial behaviors."

During cross-examination, Dr. Busby agreed that she has observed appellant mentoring others, being supportive to peers in group sessions, acting responsibly in his unit employment position, acting appropriately with female staff, holding a "positive view" of women, becoming more transparent about the factors leading to his crimes, and possessing a well-integrated and positive self-concept that includes more tolerance for differences in others.

### b.  Dr. Daisy Minter

Psychologist Daisy Minter worked at CSH, where she facilitated three different treatment groups.  In October 2011, along with social worker Adriel Reyes, Dr. Minter began facilitating a group in which appellant was assigned.  Dr. Minter explained that a treatment group averages nine patients and meets twice weekly.  Dr. Minter assigned "work paper assignments" (behavior chains, autobiographies, decision matrix) to the patients.  She said that appellant delayed doing some of this work but completed it early in 2012.  Dr. Minter further testified that appellant's initial attendance was inconsistent or he would get upset and leave the meeting early. She detected a pattern of appellant not wanting to redirect his comments during the meeting as instructed and, without cursing or being visibly upset, appellant would walk out.  Appellant frequently expressed his frustration in the group sessions about the new program not having an actual plan and manual for participants or any clear structure to it, saying, "It didn't seem like it was going anywhere."

*3. Appellant's Testimony*

The prosecution called appellant as a witness in its case. He admitted to committing two burglaries in 1971, after being released from California Youth Authority. The prosecutor asked about a 1973 incident involving a woman named Elfie. Appellant recalled burglarizing her home and confronting her on the way out the door, resulting in a struggle on the staircase and her falling down the steps. He denied punching or beating her, but he could not recall her testimony in this regard.

Appellant admitted to re-offending after his release on parole. His first predicate crime occurred in 1977 after such a release. He testified that he was living with a girlfriend when he sexually assaulted Pamela A. He entered Pamela's house with the intent to steal, thinking no one was home. When the victim came out of the bedroom and surprised him, he panicked and grabbed her, telling her to stop screaming. He then dragged her to the bedroom, tied her hands behind her back, blindfolded her, and forced her to orally copulate him. Afterward, he was arrested at the scene, and was sentenced to prison for the crime. Appellant tried to explain his "distorted thinking" at that time, when he thought "like a criminal" and exercised complete control over his victim. He admitted to being "turned on . . . to some degree" by the forced act of oral copulation. Appellant said he received no treatment while incarcerated.

After appellant was paroled in October 1981, he committed a number of burglaries for which he was not caught. In November 1981, he entered the home of Lisa S. with the intent to steal. While inside, he heard someone come into the house. The person walked by the bedroom, and appellant saw that she was female. He grabbed her, threatened her with a knife he picked up from the kitchen, and moved her to the bedroom, where he tied her hands behind her back and blindfolded her, and then raped her. Before fleeing, he also took some money from her drawer.

On December 9, 1981, appellant rang the front doorbell of Jeannie G.'s residence to see if someone was home before attempting to burglarize it. When the victim answered, surprising him, he pushed his way in, intending to rob her. He forced the victim into the kitchen, where he armed himself with a knife. He then took her to the

7

bedroom, where he tied her hands, blindfolded her, and gagged her. After looking around her house and taking money, he returned to the bedroom and decided to sexually assault her.[3] He forced her to orally copulate him, raped her from behind, and then fled.

Appellant recalled committing additional burglaries in January 1982, but did not recall the encounter with victim Paula. He did remember escaping from Santa Rita Jail on February 11, 1982. He committed additional burglaries between then and February 24, 1982, when he assaulted Joanne F. Appellant went to Joanne's residence, again planning to burglarize. When he heard someone coming upstairs, he hid in a closet. The victim opened the closet door, appellant grabbed her, pressed a knife against her, tied her hands and blindfolded her, and raped her. While attempting to rape her, he accidentally penetrated her anus and apologized.

Appellant was arrested on March 30, 1982 and sentenced to prison. He was paroled on September 21, 1994. He violated parole for being out past his curfew, and was put back in custody from November 1994 to April 1995. In July 1995, he was again returned to custody for being out past his curfew. While in prison, he incurred 19 rules violations. In 1996, he was transferred to Atascadero State Hospital (ASH), where he had an altercation that resulted in him being sent back to prison. He returned to ASH in 1998, but did not participate in the sex offender treatment program because he did not believe he had a mental disease. Appellant denied that he suffered from paraphilia, but acknowledged that he suffered from antisocial personality disorder.

In April 2007, appellant was transferred to CSH. He began participating in the sex offender treatment program there in June 2008, and believed he had reformed himself. He had completed the work for phase two of the program, but had not completed two assessment tests. According to appellant, this was not because he refused the testing, but because the hospital had not scheduled the tests.

---

[3] He could not recall if he threatened to kill her baby. He said, "I don't believe I did. I know–like I say, on one of these cases I did that. I don't know if it was this one or [another] one. I know I did in one of them."

*4. The Victims*

The prosecutor called a staff colleague as a reader to recite portions of both prior court transcripts concerning three predicate convictions and one non-predicate offense, as well as parts of two police reports. The prosecutor recited the original questions and the reader replied with the testimony of Pamela A., Joanne F., and Lisa S. Also read was an excerpt of a police report in the Joanne F. case and the Lisa S. matter. Specifying its purpose to impeach, the prosecutor read the preliminary hearing testimony involving the assault on Paula R.

## B. Defense

### 1. Experts

#### a. Dr. Brian Abbott

Psychologist Brian Abbott testified for the defense. He assessed appellant in 2009, and then again in 2012, for a combined total of five hours. He concluded that appellant suffered from antisocial personality disorder in the past, but did not suffer from it currently. Dr. Abbott explained that he did not believe antisocial personality disorder "in and of itself" could be a qualifying disorder for SVP commitment because such a disorder predisposes the person to general criminality, not sexual violence.

In Dr. Abbott's opinion, appellant did not suffer from paraphilia NOS, coercive disorder in the past or currently. According to Dr. Abbott, there is a controversy in the field about whether such a diagnosis exists at all, although he, himself, believed it did exist. However, he added that, even if such a diagnosis exists, it cannot be established by behavior alone because many repeat rapists rape out of anger towards women and a desire for power as opposed to arousal by forced sex. Dr. Abbott testified that in order to diagnose paraphilia NOS, coercive disorder, there must be some indication that the individual has urges or fantasies related to forcible or nonconsenting sexual behavior. This can come from self-report, evidence that the person while in the state hospital has been viewing pornography or reading stories about forced sex, or perhaps evidence that the person while in the state hospital has been exposing himself to female staff.

9

Dr. Abbott opined that appellant did not qualify for SVP commitment, because he did not have a current diagnosed mental disorder.

Dr. Abbott explained that he normally ends his evaluation upon finding the absence of a current diagnosed mental disorder. However, at the request of counsel, he extended his evaluation to cover the risks of re-offending. Dr. Abbott opted to administer only the Static-99R to appellant. He explained that while he had used the SVR-20 in the past, he stopped using it because it was considered a "structural professional judgment instrument," and less accurate than other actuarial tools. Using the Static-99R, Dr. Abbott concluded that appellant, who was nearly 60 years old at the time of testing, had a low risk of re-offending. Dr. Abbott disagreed with the higher scores reported by Dr. Vognsen and Dr. Starr. Dr. Abbott critiqued the methodologies employed by Dr. Vognsen and Dr. Starr.

Dr. Abbott explained that paraphilia NOS is a category in the Diagnostic and Statistical Manual of Mental Disorders (DSM) but is not itself a DSM diagnosis. He further stated 95 percent of rapes occur for non-paraphilic reasons. Dr. Abbott opined that appellant is not among the five percent who commit paraphilic rapes. For example, a hospitalized paraphilic rapist would likely possess pornography reflecting forced sex; appellant has never been found with any nor attempting to secure it. Dr. Abbott further opined that were appellant paraphilic, he also would likely manifest his difficulty in controlling his urges by exposing himself to female staff as a kind of "substitute" for an actual rape.

Dr. Abbott testified that, in his opinion, appellant committed the predicate crimes as a result of his antisocial personality disorder and he exploited opportunities that were presented during commission of his burglaries. He further explained that a diagnosis of antisocial personality disorder "better explain[s]" appellant's criminal history than does a claim of paraphilic disorder. In any event, Dr. Abbott concluded that appellant does not currently suffer from antisocial personality disorder or paraphilia NOS.

Dr. Abbott concluded that appellant does not meet the SVP criteria, does not have a currently diagnosed disorder, and does not pose a serious and well-founded risk of

10

reoffending by sexually violent behavior. His opinion took into account various factors, including the actuarial score and appellant's advancing age. Dr. Abbott concluded there is no evidence of any current condition that causes appellant serious difficulty in controlling impulses or behavior. Accordingly, he opined that appellant does not pose a substantial danger within the meaning of the SVPA.

b. Dr. Mary Jane Adams

Psychologist Mary Jane Adams testified that she evaluated appellant in 2007, 2009, and again in November 2012, for a total of approximately six hours; she also reviewed pertinent institutional documents. Like Dr. Abbott, she believed appellant's sexual assaults stemmed from antisocial personality disorder, from which he presently did not suffer. Dr. Adams opined that paraphilic rapists make up only two to five percent of all rapists. She did not believe that appellant is or was ever part of this small group of offenders. She based this opinion, in part, on the lack of evidence that appellant's sexual assaults were planned, as opposed to opportunistic. Dr. Adams further opined that, through much of his life, appellant fit the diagnosis of antisocial personality disorder, but she explained that over the past five or six years, he's "aged out," of this diagnosis; according to Dr. Adams, this is a "very common phenomenon." Dr. Adams further explained that the residual effect of this "burn out" of the disorder is that appellant occasionally "gets irritated and mouths off," but he has not been in a physical altercation for a number of years. She found no current evidence that appellant suffered from antisocial personality disorder. Indeed, she viewed appellant as beginning to develop a level of empathy that previously did not exist.

Using the Static-99R, Dr. Adams concluded that appellant was unlikely to reoffend because he had participated in five years of sex offender specific treatment, his impulsivity and aggressive behavior had reduced greatly over the years due to his age, he had developed empathy, and he had diabetes, which reduced his sex drive and ability to perform.

11

### c. Dr. Robert Owen

Psychologist Robert Owen evaluated appellant on behalf of DSH 10 times between 2002 and 2011, concluding each time that he had a diagnosed mental disorder, to wit, paraphilia NOS, and was likely to reoffend. In 2012, however, Dr. Owen changed his opinion because, over the years, paraphilia NOS had become a controversial diagnosis, and he now believed that it should not be used as a diagnosis qualifying a person for an SVP commitment. Dr. Owen did diagnose appellant, in the past and currently, with antisocial personality disorder. However, he explained that appellant's criminality resulting from the disorder had waned over time. Dr. Owens further explained that the disorder does not usually predispose people to commit sexually violent acts. He did concede that antisocial personality disorder can be used as a qualifying diagnosis for SVP commitment. Dr. Owen noted that the bulk of the person's criminal offenses would have to be sexual in nature so that a clear causative relationship could be drawn between the personality disorder and the sexual offending; Dr. Owen opined that appellant's sexual offenses appeared to be more opportunistic. On cross-examination, Dr. Owen acknowledged that his 2011 report on appellant stated, "Although paraphilia has been a controversial diagnosis, in this case with such persistent deviance, multiple victims and both urges and behaviors, he appears to be one of those few individuals who qualifies for the diagnosis." He also opined that appellant would not seek treatment on his own if released.

### d. Dr. Carolyn Murphy

Psychologist Carolyn Murphy was asked by DSH to conduct a "difference of opinion" evaluation of appellant after the two initial experts failed to agree on whether he qualified as an SVP. After evaluating numerous records and meeting with appellant, Dr. Murphy determined that appellant did not currently suffer from a mental disorder that would predispose him to commit violent sexual crimes. In her opinion, a repeat rapist could be validly diagnosed as suffering from paraphilia, which could be based on behavior alone. She had diagnosed it in the past when she found a circumstance involving physically forceful sex in the absence of significant pattern of other criminal

conduct. Dr. Murphy concluded that appellant's sexual assaults appeared to be part of his criminal personality rather than the product of paraphilia.

Dr. Murphy opined that appellant was suffering from antisocial personality disorder during commission of the predicate offenses. She recognized that an argument could be made that appellant still suffers from antisocial personality disorder, but she diagnosed him having only a general personality disorder that manifests "antisocial traits." Dr. Murphy explained that appellant's "behavior has slowed down. It's more petty rules violations, being argumentative with staff. . . . [A]sserting himself, inappropriately, but then stepping down. It doesn't escalate." She added that there are "[still some] verbal outbursts [but] that pattern has slowly changed over time. You still see some verbal outbursts . . . but not nearly the frequency or intensity." Dr. Murphy opined that some of this change could be attributed to a "less stressful, more therapeutic" environment at CSH as opposed to ASH, which she said is "run a bit more like a prison."

### 2. Social Workers

#### a. Adriel Reyes

Social worker Adriel Reyes had worked at CSH since 2008 and was a co-facilitator in the Sex Offender Treatment Program, since renamed the "Better Lives" model. He had been in charge of treatment groups for the past four years; one of his co-facilitators was Dr. Minter. Reyes explained that participants work on autobiographies and "behavior chains." Reyes described the state of institutional confusion that followed the replacement of the five phase treatment program.

Appellant had been in Reyes' group for three years. He described appellant's "rocky start," during which appellant was brash and loud, showing his unhappiness with having his old group disbanded. However, he made a rather quick adjustment and was receptive to his new group. While he and a couple other group members remain "pretty blunt," Reyes said appellant is able to "interact well" and he has developed good rapport with others, to the extent of helping convince another patient to participate in treatment.

Reyes said the "group dynamic" changed after Dr. Minter became a co-facilitator; he does not share her perspective about appellant monopolizing group participation.

13

Appellant initially was "challenging" when Dr. Minter took over. Though his attendance has been "sporadic" over the last few months, Reyes said appellant has "come a long ways" since 2011 and has "caught on a lot faster" with discussions and feedback. Reyes added that appellant was "able to verbalize a lot more of his coping skills in that group."

b. Sylvia Garcia

Social worker Sylvia Garcia had worked at CSH since 2009. She had worked with appellant for three years, seeing him on a daily basis. In her work with appellant, Garcia has counseled him in developing skill to make better choices and resolve problems. Appellant interacts appropriately with other patients and most of the time appropriately with staff as well, excepting the unit supervisor who is a "psych tech." Garcia specifically discussed a July 2012 incident in which appellant got upset and threw a television remote controller against the wall, saying such behavior was atypical. Garcia has counseled him about improving his relationship with the supervisor, including avoiding her and walking away when he gets upset rather than engaging in an argument.

### III. DISCUSSION

#### A. *Appellant Received a Fair Trial*

Appellant claims that various evidentiary and instructional errors violated his right to due process, as did instances of prosecutorial and judicial misconduct.

##### 1. *Alleged Evidentiary Errors*

Decisions concerning the admission of evidence at trial are within the province of the trial judge. (*People v. Jones* (1998) 17 Cal.4th 279, 305.) " 'As a general matter, a trial court is vested with broad discretion in ruling on the admissibility of evidence. The court's ruling will be upset only if there is a clear showing of an abuse of discretion, i.e., that the court exceeded the bounds of reason.' [Citation.]" (*People v. Dean* (2009) 174 Cal.App.4th 186, 193.) Also, " '[i]t is . . . well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice. [Citation.] "A 'miscarriage of justice' should be declared only when the court 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party

14

would have been reached in the absence of the error." [Citations.]' [Citations.]" (*People v. Fields* (2009) 175 Cal.App.4th 1001, 1018.)

Keeping in mind the general standard of review, we consider each of appellant's claims of error.

### a. Prior Convictions

Appellant claims the court erred when it admitted the "unnecessary and repetitive proof" of his prior convictions despite his pre-trial concession that he had three qualifying predicate offenses and was collaterally estopped from relitigating their legality.

Preliminarily, the prosecution was entitled to refuse any concession or stipulation by appellant because the challenged evidence remained probative to the issues before the jury. (*People v. Garceau* (1993) 6 Cal.4th 140, 182, abrogated on another ground as stated in *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [prosecution cannot be compelled to accept a stipulation which would " 'deprive the state's case of its persuasiveness and forcefulness' "]; *People v. Hall* (1980) 28 Cal.3d 143, 152 ["if the facts to which the defendant has offered to stipulate retain some probative value, then evidence of such facts may be introduced"], overruled on another ground in *People v. Newman* (1999) 21 Cal.4th 413, 415.)

The details of the offenses were relevant to prove appellant was convicted of a sexually violent offense against two or more victims. The jury also had to find that appellant had a diagnosed mental disorder and that the disorder made him a danger to the health and safety of others. (See § 6600, subd. (a); CALJIC No. 4.19.) The description of the predicate convictions provided the jury with some of the basis for diagnosing appellant with paraphilia NOS and antisocial personality disorder. Moreover, the details of the offenses were probative of appellant's risk of recidivism. Both Dr. Vognsen and Dr. Starr opined that defendant posed a fairly high risk of committing another SVP offense based, in part, on the facts of the predicate convictions.

In *People v. Hubbart* (2001) 88 Cal.App.4th 1202, the court resolved a similar case where it concluded that the trial court had not abused its discretion by admitting

detailed evidence of numerous sexual assaults the defendant had committed, over his objection: "Details about defendant's past sexually violent conduct were important to the jury's determination of these issues. The way that defendant targeted similar victims and committed the crimes in a similar manner showed his predatory behavior and the risk he posed if released. Although there was expert testimony on those issues, the details of the crimes were helpful for the jury's understanding of the experts' opinions and diagnoses. Although the details of the crimes were odious, it was necessary for the jury to learn not just that defendant had committed numerous sex offenses, but the scope and nature of his sexually predatory behavior." (*Id.* at p. 1234.)

To the extent appellant suggests that allowing the victims' testimony to be read into the record was cumulative we are similarly not persuaded. Not only was this evidence relevant to impeach appellant's testimony, it represented a relatively minor portion of the vast array of evidence that was introduced to establish that appellant met the criteria for qualifying as an SVP.

Finally, appellant takes issue with the admission of evidence regarding the non-predicate offense involving Paula R. Below, defense counsel objected to this evidence on the ground that the evaluators had not reviewed Paula R.'s testimony in rendering their opinions. As with the testimony of the other victims, the prosecutor offered Paula R.'s testimony for impeachment purposes. This testimony was also relatively brief, and no more prejudicial than the evidence pertaining to the predicate offenses. Also, there was little risk of confusion. Thus, applying Evidence Code section 352, we find no abuse of discretion in admitting this evidence.

Because we reject appellant's claim of error, we reject his due process claim as well.

### b. Failure to Submit to Testing

Appellant contends the trial court erred in allowing evidence that he refused to participate in "two diagnostic tests." Though not identified by name to the jury, the two tests were a polygraph test and a penile plethysmograph (PPG) test. They were described as an assessment "that looks at disclosure of sexual behaviors that a person has done in

16

the past" (polygraph) and an assessment that "measure[s] sexual arousal and sexual interests in a variety of both appropriate and inappropriate or deviant stimuli" (PPG). A behavioral specialist from CSH testified that these assessments were important because they provided an objective measure of the person's current level of deviant sexual interests and sexual preoccupation, and provided information from which the hospital could develop a treatment plan for the individual and measure progress in treatment.

Dr. Starr testified that appellant told her that one of the two assessments he refused involved showing pictures of consensual and nonconsensual acts, and that if they showed slides oriented toward his crimes, he was concerned that his response would be "predictable." In Dr. Starr's opinion, the statement demonstrated that appellant wanted to pick and choose what treatment he wanted to participate in, which made it unlikely he would follow through with voluntary treatment in the community. It also suggested that appellant himself was concerned that he would still be aroused by sexually deviant material.

Dr. Vognsen testified that appellant had refused to take "the diagnostic test that would see whether he still has got fantasies about rape," which he considered significant because appellant claimed not to have such fantasies. "If he doesn't have them," questioned Dr. Vognsen, "why not open yourself up to that diagnostic assessment so you can demonstrate that? He said nah, I don't want to do that. That seems to me that he's covering up something there." When he took the stand, appellant professed that he did not refuse to take either assessment test.

Appellant contends the court prejudicially erred in allowing mention that he refused to take, albeit not by name, the polygraph and PPG. He adds that by "not naming the 'tests,' it gave them a false aura of importance and significance." We are not persuaded.

Whether the results of a polygraph or PPG are admissible in an SVP case is questionable. (*People v. Fields, supra,* 175 Cal.App.4th 1001, 1017 [noting Evid. Code prohibits polygraph evidence in criminal proceedings, but "we have found no statutory or judicially created bar to a party offering polygraph evidence in civil proceedings"];

17

*People v. John W.* (1986) 185 Cal.App.3d 801, disapproved on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 717 [trial court did not err in excluding expert opinion that defendant was not sexually deviant based on PPG results where defendant failed to show the test was a reliable means of diagnosing sexual deviancy].) Finding the admission of the challenged evidence to be harmless, we decline to enter the controversy.

First, the evidence that appellant refused to take the diagnostic assessments was not offered to establish that he was a liar or a sexual deviant. Rather, the experts testified that the tests were useful in helping address appellant's treatment needs and in measuring his progress. This evidence, therefore, was relevant to the issue of whether appellant was fully participating in treatment. It was also useful in helping the jury assess the weight to be given to the experts' opinions.

Second, even without the challenged evidence, there is no reasonable probability that appellant would have received a more favorable result. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Dr. Starr testified that appellant's diagnoses remained current because they were chronic, lifelong disorders. She found that he remained dangerous and in need of custodial treatment based on his scores on actuarial tests, his dropping out of sex offender treatment twice, his failure to consistently attend treatment even when participating, his lack of cooperation with authority, the unlikelihood of his seeking treatment on a voluntary basis if released, his grievance thinking and anger problems, and his lack of insight into his behavior. Similarly, Dr. Vognsen testified that appellant remained dangerous because of his actuarial test scores, history of dropping out of sex offender treatment, inconsistent participation when enrolled in treatment, admitted continuing sex drive, poor cooperation with supervision, poor anger control, and lack of mitigating factors such as health concerns. Accordingly, on this record, there is no reasonable probability the jury would have found that appellant did not qualify as an SVP absent the evidence that he refused to participate in the two diagnostic tests. We also conclude that appellant's right to due process was not violated.

2. *Alleged Instructional Errors*

Appellant raises several claims of instructional error.

18

"In reviewing any claim of instructional error, we must consider the jury instructions as a whole, and not judge a single jury instruction in artificial isolation out of the context of the charge and the entire trial record." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.) There is no instructional error if the instructions, as a whole, "are unobjectionable, even though isolated passages from some of the instructions may be subject to criticism." (*People v. Kainzrants* (1996) 45 Cal.App.4th 1068, 1074-1075.)

"A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024.) "The trial court is not required to give [a pinpoint instruction that explains or highlights a defense theory] on its own initiative, and if the instruction as given is adequate, the trial court is under no obligation to amplify or explain in the absence of a request that it do so." (*People v. Mayfield* (1997) 14 Cal.4th 668, 778, overruled on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390.) A defendant's failure to request a clarifying or amplifying instruction at trial waives a claim on appeal that the instruction given was ambiguous or incomplete. (*Id.* at pp. 778-779; *People v. Cole* (2004) 33 Cal.4th 1158, 1211; *People v. Hart* (1999) 20 Cal.4th 546, 622; *People v. Sanchez* (2001) 94 Cal.App.4th 622, 635.)

a. Use of "Admission" Instruction (CALJIC No. 2.71)

At trial, appellant admitted that he had acted criminally and anti-socially in the past. The trial court instructed the jury with a modified version of CALJIC No. 2.71. As given, the instruction read: "An admission is a statement made by the respondent which does not by itself acknowledge his status as a sexually violent predator for which the respondent is on trial, but which statement tends to prove his status when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the respondent made an admission, and if so, whether that statement is true in whole or in part." However, the trial court failed to include language that these admissions must be viewed with caution.

19

Appellant contends that there was no substantial evidence to support giving this instruction and, alternatively, even if such evidence existed, the omission of the cautionary language constituted prejudicial error. We disagree. Appellant's admission at trial that he had previously "acted out criminally," while suffering from anti-social personality disorder, when viewed with the rest of the evidence, had a tendency to prove his status as sexual predator. Moreover, appellant's claim that the trial court was required to instruct the jury sua sponte to view this evidence with caution is without merit. The omitted, cautionary language pertains to oral admissions *not made in* court.[4] Indeed, the California Supreme Court has explained that "the primary purpose of the cautionary instruction 'is to assist the jury in determining if the statement was in fact made.' [Citation.]" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 94.) Here, appellant made these admissions in open court. Accordingly, there is no dispute that appellant, in fact, made such statements. (*People v. Stankewitz, supra,* 51 Cal.3d at p. 94 ("[t]he testimony . . . was uncontradicted; [appellant] adduced no evidence that the statement was not made, was fabricated, or was inaccurately remembered or reported"].) Moreover, neither psychologist relied on the appellant's opinion of his prior criminality in forming their opinion that he currently met the criteria for an SVP.

b. Failure to Sua Sponte Instruct Regarding Nature of Commitment

Appellant contends the trial court should have instructed the jury sua sponte that a a determination that he qualified as an SVP would result in his indefinite commitment, rather than the renewable, two-year commitment he would have received under a prior version of the SVPA.[5] Appellant argues that failing to instruct the jury on the

---

[4] The bracketed language of CALJIC No. 2.71 is as follow: "[Evidence of an oral admission of [a] [the] defendant not contained in an audio or video recording and not made in court should be viewed with caution.]"

[5] Prior to 2006, a person determined to be an SVP was committed to the custody of the DMH for a period of two years; to keep an SVP in custody beyond the initial two-year term, the People were required to file a new petition to extend the commitment and again prove to a jury beyond a reasonable doubt that defendant is an SVP. (See *Bourquez v. Superior Court* (2007) 156 Cal.App.4th 1275, 1280-1281.) In 2006, the SVPA was amended by statute and voters' initiative (Proposition 83, known as Jessica's Law) to

20

consequences of its true finding "may give them the mistaken impression that a civil commitment is short term and allows for future actual judicial review." This contention is baseless.

" 'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.' [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 115.) At appellant's SVP trial, the jury was asked to determine, based on the evidence presented by the parties, whether defendant is an SVP and, if so, whether he was likely to reoffend if released into the community. The trial court properly instructed the jury on the principles of law governing its resolution of those issues. The duration of any commitment imposed subsequent to the jury's findings was irrelevant to the issues at trial. Accordingly, the trial court was not required to instruct the jury sua sponte regarding the consequences of an SVP finding. We similarly reject appellant's due process claim.

c. Failure to Give a Sua Sponte Instruction Quantifying the Degree of Risk

Appellant argues reversal is required because the court did not adequately instruct on "key elements" regarding the risk of reoffense that is necessary to commit a person as an SVP. He claims the court should have given a sua sponte instruction that more precisely defined the degree of risk. We reject this contention.

By statute, an SVP must have a "diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) "Likely" has been judicially construed to mean " 'the person presents a *substantial danger,* that is, a *serious and well-founded risk,* that he or she will commit such crimes if free in the community.' " (*People v. Roberge* (2003) 29 Cal.4th 979, 982, 986.) The risk of reoffense must be greater than a

provide that SVP's be committed by the court to the DMH for an indefinite period of time rather than the renewable two-year commitment provided for under existing law. (*Ibid.*)

21

"mere possibility," but need not be "better than even," i.e., greater than 50 percent. (*Id.* at pp. 985-988.) The jury was instructed as much.

Appellant argues that the instructions did not go far enough because they "fail[ed] to explain the requisite minimum level of risk that the jury must unanimously agree upon." Specifically, he contends the jury should have been further instructed regarding the meaning of "likely," "danger," "substantial danger," and "substantial, serious, well-founded" risk. He, however, did not request an additional instruction on this point and has not, in his appellate briefs, suggested clarifying language. "Once the trial court adequately instructs the jury on the law, it has no duty to give clarifying or amplifying instructions absent a request." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1013.) Accordingly, we reject appellant's due process claim.

### d. Failure to Specify the Types of Mental Illnesses Qualifying as Mental Disorders Under the SVPA

Appellant contends the trial court erred by failing to instruct the jury on the types of mental illnesses that qualify as "mental disorders" under the SVPA. We disagree.

CALJIC No. 4.19 advised the jury that an SVP must have "a diagnosed mental disorder that makes him a danger to the health and safety of others . . . ." "Diagnosed mental disorder" was defined as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." These definitions tracked the statutory language of the SVP Act. (See § 6600, subds. (a)(1), (c).)

Appellant argues that the instruction was inadequate because it failed to specify whether antisocial personality disorder or paraphilia NOS "standing alone" were "legally sufficient disorders." He further contends that antisocial personality disorder "does not suffice" and the jury should have been instructed on this point. We disagree.

In *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1158 (*Hubbart*), the Supreme Court rejected an argument that the SVPA was unconstitutional because it did not exclude from its purview "antisocial personality disorders or other conditions

22

characterized by an inability to control violent antisocial behavior." Nothing in the SVPA or the federal Constitution prohibits a jury from relying on a personality disorder as a basis for an SVP determination. (*Hubbart,* at pp. 1158-1161.)

Moreover, the instruction as given was a correct statement of the law and appellant did not request an additional instruction. As such, the court was not obligated to give a clarifying instruction. (*People v. Butler, supra,* 187 Cal.App.4th at p. 1013.) We find no merit to appellant's due process claim based on this alleged error.

> e. Failure to Give Unanimity Instruction as to Mental Disorder

Appellant contends that the trial court committed prejudicial error by failing to instruct the jury, sua sponte, they were required to unanimously agree on the specific mental disorder qualifying him as an SVP. Appellant bases his contention on the unanimity rule applicable in criminal proceedings. The unanimity rule provides that "[w]here the evidence shows that several criminal acts may have been committed and the defendant is not charged separately with a violation of all those acts, the trial court is required, sua sponte, to instruct the jurors that they must unanimously agree beyond a reasonable doubt upon the particular act constituting the crime. [Citations.] The purpose of this rule is to insure that all jurors agree beyond a reasonable doubt that one particular act or acts constitute the crime charged. [Citations.]" (*People v. Washington* (1990) 220 Cal.App.3d 912, 915.)

The SVPA requires that a jury's *verdict* be unanimous, but it does not require unanimity as to each element necessary to support an SVP finding. (*People v. Carlin* (2007) 150 Cal.App.4th 322, 347, *People v. Fulcher* (2006) 136 Cal.App.4th 41, 59.) Moreover, "[a]n SVP proceeding is civil, and not criminal, and the unanimity requirement for an SVP proceeding is established by statute. [Citation.] Under the SVPA, the jury must determine whether the requirements for classification as an SVP have been established 'beyond a reasonable doubt' and the jury's *verdict* must be unanimous. [Citations]." (*People v. Carlin, supra,* 150 Cal.App.4th at p. 347.) Nevertheless, whereas the jury's verdict must be unanimous, "[t]here is no statutory requirement regarding unanimity for each subpart of the SVP determination." (*Id.* at

23

p. 347 [rejecting claims that the trial court erred in failing to instruct the jurors that they must unanimously agree on which prior convictions involved substantial sexual conduct and on which acts constituted substantial sexual conduct]; see also *People v. Fulcher, supra,* 136 Cal.App.4th at p. 59 [concluding that because "SVP proceedings are civil in nature, even though some criminal procedural protections apply, the rule requiring a unanimity instruction does not apply in SVP civil commitment proceedings. [Citations]"].) Accordingly, because the trial court adequately instructed the jury on each of the elements of appellant's civil commitment, the court did not commit prejudicial error by failing to give a unanimity instruction sua sponte on the "diagnosed mental disorder" element. Accordingly, we similarly reject appellant's due process claim.

### 3. *Alleged Prosecutorial Misconduct*

Appellant contends the prosecutor committed misconduct and violated his right to due process by asking him "indecent and prurient" questions about his prior convictions for the purpose of humiliating and embarrassing him in front of the jury. Appellant also claims he was denied a fair trial by the prosecutor's denigrating questions about Dr. Abbott's integrity.

#### a. Legal Principles

"A witness may not be examined on matters that are irrelevant to the issues in the case. [Citations.]" (*People v. Mayfield, supra,* 14 Cal.4th 668, 755.) Moreover, questions that go "beyond an attempt to elicit facts within [a witness's] knowledge and [are] instead designed to engage him in an argument" are improper. (*People v. Johnson* (2003) 109 Cal.App.4th 1230, 1236.)

In considering the effect of the prosecutor's conduct, we are mindful that "[p]rosecutors . . . are held to an elevated standard of conduct. 'It is the duty of every member of the bar to "maintain the respect due to the courts." (Bus. & Prof. Code, § 6068, subd. (b).) A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state. [Citation.] As the United States Supreme Court has explained, the prosecutor represents "a sovereignty whose obligation

24

to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." [Citation.]' " (*People v. Hill* (1998) 17 Cal.4th 800, 819-820, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

" 'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 835 (*Jablonski*); see *People v. Hill, supra,* 17 Cal.4th at p. 819, [pattern of prosecutorial misconduct so egregious as to infect trial with fundamental unfairness and make conviction a denial of due process].) " 'Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' [Citation.]" (*Jablonski, supra,* at p. 835.) "Misconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected. (*People v. Watson*[, *supra*,] 46 Cal.2d [at p.] 836; see *People v. Holt* (1984) 37 Cal.3d 436, 458.)" (*People v. Shazier* (2014) 60 Cal.4th 109, 127 (*Shazier*).)

"As a prerequisite for advancing a claim of prosecutorial misconduct, the defendant is required to have objected to the alleged misconduct and requested an admonition 'unless an objection would have been futile or an admonition ineffective.' [Citation.]" (*Jablonski, supra,* 37 Cal.4th at p. 835.) " ' "To prevail on a claim of prosecutorial misconduct based on remarks to the jury," ' " there must appear " ' "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." [Citation.] "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide." ' [Citation.]" (*Ibid.*)

b. "Indecent and Prurient" Questions Regarding Offenses

Appellant contends the prosecutor committed prejudicial misconduct by asking him "indecent and prurient" questions designed to humiliate and embarrass him. We are

25

not persuaded.

Although appellant cites numerous questions posed by the prosecutor that allegedly constituted misconduct, as the People correctly observe, the defense did not object to these questions and request an admonition to the jury. Because an objection and admonition would have cured any harm, the claim of misconduct was forfeited on appeal. (E.g., *People v. Linton* (2013) 56 Cal.4th 1146, 1205.)

In any case, even assuming the issue was preserved for appeal, we would find no prejudicial misconduct as to these questions. The factual circumstances of appellant's crimes were crucial to the question of whether he was an SVP, both because they were qualifying offenses for purposes of section 6600, and because they were part of appellant's pattern of committing sexual offenses, to wit: Each assault occurred in the victim's home. Appellant blindfolded each victim, threatened each with a knife, and also made verbal threats. He tied the wrists of one victim and the hands of another, also hitting and strangling her. The trial court could reasonably conclude that prosecutor's questions, while graphic and unpleasant, were properly designed to elicit defendant's recollection of the facts in question.

c. Denigration of Defense Expert Witness

Appellant further complains that the prosecutor denigrated Dr. Abbott's integrity. During cross-examination, Dr. Abbott testified that he had conducted about 185 SVP evaluations, in which he completed full evaluations at the request of the defense. He estimated that about 20 to 25 percent of the time he has declined to conduct evaluations where, after reading the state's report, he has agreed that the individual meets the criteria to be deemed an SVP. Of the 185 SVP evaluations he has conducted, on five or six occasions, or two to three percent of the time, Dr. Abbott has concurred with the state experts. The following colloquy then ensued: "Q. And in those five or six times did you then testify for the state? [¶] A. No. The information is privileged. The state does not learn of my evaluations in those circumstances. [¶] Q. And so you think that the evaluations are privileged? [¶] A. Yes. The difference between myself and a state evaluator [is] it falls under attorney/client privilege. If I conclude that the individual

meets the criteria, the defense attorney does not turn my report over to the district attorney."

The prosecutor then asked Dr. Abbott whether he possessed a law degree, had ever been to law school, or had obtained legal training by an objective party. Defense counsel's objection that the prosecutor was misstating the law and facts with this line of questioning was overruled. In any event, the prosecutor ceased this line of questioning. The next day, defense counsel complained to the court that the prosecutor had committed misconduct in asking these questions because she sought to lead the jury to believe Dr. Abbott was biased, when in fact, revealing information about a patient to the prosecutor would have violated both the attorney-client privilege and the psychotherapist-patient privilege. "In short," said defense counsel, "I'm asking that she not do it with any of the other expert witnesses and that the jury be admonished to disregard the question. That it was an improper question."

In response, the prosecutor asserted that SVP proceedings were subject to the rules of civil discovery, and that if under the civil rules, a request for discovery was made for any and all evaluations conducted by the defense, an evaluation by a defense expert in favor of SVP commitment would have to be turned over to the prosecution. The court denied the motion for an admonition, finding no prosecutorial misconduct, but instructed the prosecutor not to ask similar questions of other defense experts.

We conclude that, even if the prosecution's questions were improper, there is no demonstrable prejudice to appellant. Dr. Abbott's bias in favor of the defense was already established prior to the questions about whether he had provided the state with the five or six evaluations in which he agreed that the individual met the SVP criteria. First, Dr. Abbott conducted 185 evaluations, all for the defense. Second, he explained that he would not even take a case if, after reading the state's evaluation, he believed the individual meets the criteria of an SVP; he estimated that this occurs 20 to 25 percent of the time. Third, of the 185 evaluations conducted for the defense, Dr. Abbott had only agreed with the state evaluators two to three percent of the time. Any questions relating to privilege and discovery vis-à-vis this small percentage of cases posed little risk of

inflaming the jury. On this record, there is no reasonable probability that appellant would have received a more favorable outcome had the court admonished the jurors that the questions regarding privilege and discovery should be disregarded. (*People v. Watson, supra,* 46 Cal.2d at p. 836.) We similarly find no abridgement of appellant's right to due process. "[F]undamental fairness [is] the touchstone of due process." (*Gagnon v. Scarpelli* (1973) 411 U.S. 778, 790.) Any error here was minor, as it did not " 'so infuse[] the trial with unfairness as to deny due process of law.' " (*Estelle v. McGuire* (1991) 502 U.S. 62, 75.)

### 4. Alleged Judicial Misconduct or Bias

Appellant contends he was denied a fair trial because the trial court asked defense experts "pointed, critical question," while it "soft-pedaled with the state's experts." He also complains that the court made "strange hearsay rulings" with respect to proffered defense expert testimony. We disagree.

"A court commits misconduct if it persistently makes discourteous and disparaging remarks so as to discredit the defense or create the impression it is allying itself with the prosecution. [Citations.]" (*People v. Santana* (2000) 80 Cal.App.4th 1194, 1206-1207.) "The mere fact that a judge examines a witness at some length does not establish misconduct . . . ." (*People v. Pierce* (1970) 11 Cal.App.3d 313, 321.) "[I]t is not merely the right but the duty of the trial judge to see that the evidence is fully developed before the trier of fact and to assure that ambiguities and conflicts in the evidence are resolved insofar as possible." (*People v. Carlucci* (1979) 23 Cal.3d 249, 255.) "A trial court has both the discretion and the duty to ask questions of witnesses, provided this is done in an effort to elicit material facts or to clarify confusing or unclear testimony." (*People v. Cook* (2006) 39 Cal.4th 566, 597; see also Pen. Code, § 1044 [judge has duty to "control all proceedings during the trial . . . with a view to the expeditious and effective ascertainment of the truth regarding the matters involved"]; Evid. Code, § 775 [court may call witnesses].)

A " '[d]efendant's failure to object at trial [about alleged judicial misconduct,] particularly where . . . such action would have permitted the court to clarify any possible

misunderstanding resulting from the comments, bars his claim of error on appeal.' [Citation.] 'The purpose of the rule requiring timely objection is to give the trial court the opportunity to cure any error, if possible, by an admonition to the jury.' [Citation.]" (*People v. Sanders* (1995) 11 Cal.4th 475, 531.)

First, appellant did not object to the conduct he now challenges. As such, this contention is forfeited on appeal. (See *People v. Sturm* (2006) 37 Cal.4th 1218, 1237.) In any event, even if we were to conclude appellant's claims were properly before us, those claims fail on the merits.

### a. Challenged Conduct

#### (i) Questions Regarding Validity of Criminal History Data

The alleged misconduct arises in the context of the prosecutor's cross-examination of defense expert Dr. Abbott, who testified that he relied on a nonpublished study by Dr. Jesus Padilla that was based on non-public hospital and criminal history records. The prosecutor questioned Dr. Abbott about the validity of the criminal history in Dr. Padilla's study, indicating that it was questionable. The trial court then asked Dr. Abbott about how Dr. Padilla gained access to the criminal data: "[THE COURT:] How did he get access to [this information]? He's a private practitioner? [¶] [THE WITNESS:] No. He was working at Atascadero State Hospital. [¶] [THE COURT:] How did he gain access to criminal history records? [¶] [THE WITNESS:] They have a computer at the hospital and can access it."

#### (ii) Leading Questions by Defense Counsel

As further evidence of the trial court's bias, appellant points to the judge's interjection in the following colloquy between defense counsel and Dr. Abbott: "[MS. GEORGE]: And directing your attention to page three under Roman Numeral IV, *Precommitment Assessment Process*, item number D. [¶] What does this protocol say regarding which test the evaluator is to use? [¶] . . .[¶] [THE WITNESS:] It does not specify any particular test. [¶] [MS. GEORGE:] Actually, doesn't it say the evaluator, according to his or her professional judgment, shall apply tests or instruments along with other static dynamic risk factors— [¶] [THE COURT:] Miss George, is this

29

impeachment of your own witness, or is this leading or what is this? [¶]
[MS. GEORGE:] It's leading for the sake of brevity, but I'll have Doctor Abbott testify as to what it says. [¶] Doctor Abbott, could you tell us exactly what subsection D says regarding tests?"

(iii) Hearsay Rulings

As Dr. Abbott proceeded to read from the report, the prosecutor objected on hearsay grounds, which the court granted and noted that "[i]t will be a continuing objection."

Then, as defense counsel sought to clarify that Dr. Abbott had relied in part on the deposition of Dr. Padilla in another case, the prosecutor again objected on hearsay grounds: "[MS. LOUIS:] Your Honor, objection to hearsay. And can I have a standing hearsay objection to this exhibit as well? [¶] [THE COURT:] That will be sustained if you're going to be reading parts of the document. [¶] [MS. GEORGE:] I'm not going to read the document. I'm going to have Doctor Abbott testify to what the document says since he's been cross-examined about his reliance on the Padilla documents. [¶] [THE COURT:] Okay. If you go into those portions that he was cross-examined on. [¶] [MS. GEORGE:] Thank you. It actually goes to the entire — [¶] [THE COURT:] We're not reading the transcript into the record."

Defense counsel then attempted to ask Dr. Abbott about the expressed purpose of the Padilla study: "[MS. GEORGE]: And what was his purpose in conducting the study? [¶] MS. LOUIS: Objection. Hearsay. [¶] THE COURT: Sustained. [¶] MS. GEORGE: It's the basis, your Honor, on his reliance on the documents. [¶] THE COURT: It's sustained."

b. Analysis

"The question for us to decide is whether the judge 'officiously and unnecessarily usurp[ed] the duties of the prosecutor . . . and in so doing create[d] the impression that he [was] allying himself with the prosecution[.]' [Citation.]" (*People v. Clark* (1992) 3 Cal.4th 41, 143; see *People v. Cummings* (1993) 4 Cal.4th 1233, 1305.)

In his reply brief, appellant asserts that "the trial judge took off after Dr. Abbott and disrupted the examination with its hostility to what was being said."

However, whether a particular question or series of questions by a judge goes too far is difficult to assess on a cold record because we cannot determine if the tone of any particular question was other than neutral, and because the transcript does not indicate the length of pauses by the attorneys in between the answer to one question and the asking of another. (*People v. Raviart* (2001) 93 Cal.App.4th 258, 272 [trial court is " 'in a better position than the reviewing court to know when the circumstances warrant or require the interrogation of witnesses from the bench' "].)

And even if this trial judge asked *too many* questions, that does not mean he lost his *neutrality.* Nothing about the *content* of the questions shows a lack of neutrality. Although appellant complains about the court's "strange" hearsay ruling, he neither provides any legal authority or cogent analysis to support his claim. To meet his burden on appeal, appellant must do more than point out an error and rest there. In any case, to the extent the trial court refused to allow defense counsel to ask Dr. Abbott why Dr. Padilla conducted his study, Dr. Abbott would have based his answer on Dr. Padilla's testimony in another case, which was clearly hearsay.

Finally, we observe that the trial court instructed the jury with CALJIC No. 17.30, which provides: " I have not intended by anything I have said or done, or by any questions that I may have asked, or by any ruling I may have made, to intimate or suggest what you should find to be the facts, or that I believe or disbelieve any witness. [¶] If anything I have done or said has seemed to so indicate, you will disregard it and form your own conclusion." We presume the jury followed this instruction and would consider the content of the answers to the trial court's questions and not the fact that the questions were asked *by the trial court* in assessing the evidence. (See *People v. Cook* (2006) 39 Cal.4th 566, 515–516.) Accordingly, we reject the claim of judicial misconduct. We similarly find no abridgement of appellant's right to due process.

**B. *Sufficiency of the Evidence***

Appellant contends the evidence is insufficient to support the jury's finding that he is an SVP.

" 'In reviewing the evidence sufficient to support a commitment under [the SVPA], "courts apply the same test as for reviewing the sufficiency of the evidence to support a criminal conviction." ' (*People v. Carlin* (2007) 150 Cal.App.4th 322, 333.) 'Thus, this court must review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the determination below. [Citation.] To be substantial, the evidence must be " 'of ponderable legal significance . . . reasonable in nature, credible and of solid value.' " ' ( *People v. Mercer* (1999) 70 Cal.App.4th 463, 466.)" (*People v. McCloud* (2013) 213 Cal.App.4th 1076, 1088 (*McCloud*).)

Here, the jury was instructed that, in order to prove that appellant is an SVP, the People must prove, beyond a reasonable doubt, that he: (1) "has been convicted of a sexually violent offense against two or more victims," (2) "has a diagnosed mental disorder," and (3) "the disorder makes him . . . a danger to the health and safety of others in that it is likely that he . . . will engage in sexually violent predatory criminal behavior unless confined within a secure facility." (See CALJIC No. 4.19.)

The jury was also instructed that the term " 'Diagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (CALJIC No. 4.19.)

Appellant contends that there is insufficient evidence to support a finding that he has a "diagnosed mental disorder" because the diagnosis of paraphilia was "invalid" and the diagnosis of a personality disorder is not a mental disorder sufficient to justify commitment under the SVPA. We disagree.

*1. Paraphilia*

Appellant disputes the validity of paraphilia NOS as a sufficient "diagnosed mental disorder" within the meaning of the SVPA. He further contends that even if this

32

diagnosis was valid, there was insufficient evidence supporting its past or current application in his case.

Appellant argues, at length, about "the demise of paraphilia NOS." According to appellant, a diagnosis of paraphilia NOS "does not suffice for commitment" because "[n]umerous professions [have] concluded that it is invalid and diagnostically unreliable." In support of these contentions, he relies on articles that were not part of the record below. Accordingly, these materials are not properly before this court. (*People v. Jacinto* (2010) 49 Cal.4th 263, 272-273, fn. 5 [appellate court not forum to develop additional factual record].)

In any event, the fact that not all psychological professionals agree about whether paraphilia constitutes a mental condition that would justify involuntary civil commitment does nothing to undermine the sufficiency of the evidence supporting the verdict. (See *Kansas v. Hendricks* (1997) 521 U.S. 346, 360, fn. 3 (*Hendricks*); *People v. Flores* (2006) 144 Cal.App.4th 625, 633.) Moreover, that such disagreements exist "do not tie the State's hands in setting the bounds of its civil commitment laws. In fact, it is precisely where such disagreement exists that legislatures have been afforded the widest latitude in drafting such statutes." (*Hendricks, supra,* 521 U.S. at p. 360, fn. 3.) Consistent with this leeway, the SVPA provides that "[t]he term diagnosed mental disorder includes conditions . . . that affect a person's ability to control emotions and behavior and predispose that person to commit criminal sexual acts to an extent that makes him or her a menace to the health and safety of others." (*McCloud*, *supra*, 213 Cal.App. 4th at pp. 1088–1089. See § 6600, subd. (c).)

To the extent appellant challenges the sufficiency of the evidence supporting a past and present diagnosis, the record belies this claim. Dr. Vognsen explained the basis of his opinion to the jury as follows: "We have a sexual offense history of him having been convicted of sexual offenses against three adult women over [a] period of about four or five years. There [were] also others he was charged [with] offending against, but the charge was plea bargained out. So we have three victims of very clearly nonconsenting sexual activities and one that was charged but not convicted. And one where it seems to

be he was in the process of wanting to commit a sexual assault on her but she got away from him. So there's no charge of any sexual assault against her but a charge of burglary against her. [¶] So to my way of looking at it, five women who were attacked by him, clearly for sexual purpose, and I think the fifth one also."

Dr. Vognsen also considered the facts that appellant was in consensual relationships during at least some of his offenses, but nevertheless pursued nonconsensual sex, and that going to prison for his sexual assaults did not deter him from reoffending shortly after being paroled, demonstrating that he was very strongly driven to commit the offenses regardless of the consequences. He further testified that appellant's paraphilia was current because the disorder was lifelong, though the person could learn to control it over time with therapy. Dr. Vognsen also discounted the fact that appellant had not raped recently because he had been in prison or in a heavily supervised hospital environment for the last several years with little opportunity to reoffend.

Dr. Starr also explained the reasons for her diagnosis of paraphilia. Appellant's crimes followed a similar pattern: he found a woman who was home alone, entered her residence, blindfolded her, threatened her with a knife and verbally, and sexually assaulted her. She testified that appellant's explanation that he acted opportunistically in raping his victims was highly unlikely given the sheer number of times he allegedly happened to burglarize a woman who was home alone. Indeed, one of his victims offered him money, and he replied that it was not money he was there for, again demonstrating that the rape was not opportunistic, but the product of an urge that he planned and carried out. He reoffended within a short time of being paroled from prison, demonstrating that he could not control his deviant sexual impulses for nonconsenting sex notwithstanding the consequences. He also reoffended shortly after escaping from custody, again demonstrating that his urges overrode his interest in hiding from authorities. In Dr. Starr's opinion appellant's paraphilia was current because paraphilias tend to be chronic and lifelong, appellant had started but not completed treatment, and appellant had refused to participate in an assessment based on fear he would react to deviant materials.

34

Although appellant's experts testified variously that appellant did not suffer from paraphilia because the disorder could not be diagnosed based on behavior alone (Dr. Abbott), because his sexual assaults appeared to be opportunistic or the product of his antisocial personality (Drs. Adams and Murphy), or because paraphilia based on attraction to nonconsenting sex is an invalid disorder (Dr. Owen), the jury was entitled to credit the testimony of Drs. Vognsen and Starr, who testified otherwise. (*People v. Flores, supra,* 144 Cal.App.4th at p. 633.) Accordingly, appellant's claim of insufficient evidence fails.

### 2. *Antisocial Personality Disorder*

Appellant next contends antisocial personality disorder standing alone is insufficient to support a finding that he has a "diagnosed mental disorder" within the meaning of the SVPA. (§ 6600, subd. (a)(1).) Under the SVPA, a " '[d]iagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) In appellant's view, this reference to a disorder that predisposes a person to "criminal sexual acts" means the qualifying diagnosis must be some form of paraphilia. This does not mean, however, that the diagnosed mental disorder must be a sexual disorder. For example, in *People v. Burris* (2002) 102 Cal.App.4th 1096, 1108-1109, the court concluded that antisocial personality disorder could qualify as a mental disorder within the meaning of the SVPA. However, it is not clear whether *Burris* stands for the proposition that antisocial personality disorder *alone* qualifies a defendant for SVP status because there the defendant also was diagnosed with a paraphilia associated with rape. We need not enter this debate because here, like in *Burris*, appellant was dually diagnosed with paraphilia and antisocial personality.

In sum, it was sufficient for the People to show that appellant suffered from paraphilia and that his antisocial personality caused him to lose control, become dangerous to others, and become predisposed to act on his paraphilic interests. There was substantial evidence supporting the finding that he qualified as an SVP.

35

## C. *Constitutional Challenges to the SVPA*

### 1. *Vagueness*

Appellant contends the SVPA is unconstitutionally vague because it fails to define the "likely" to reoffend standard and fails to define the kind of mental disorder that may serve as a basis for an SVP finding,

"Due process requires fair notice of what conduct is prohibited. A statute must be definite enough to provide a standard of conduct for its citizens and guidance for the police to avoid arbitrary and discriminatory enforcement. [Citations.] 'Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.' [Citation.] [¶] . . . A statute is not vague if . . . any reasonable and practical construction can be given to its language. Reasonable certainty is all that is required. [Citations.]" (*People v. Townsend* (1998) 62 Cal.App.4th 1390, 1400-1401.) As our Supreme Court has explained, "a law that is 'void for vagueness' not only fails to provide adequate notice to those who must observe its strictures, but also 'impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.' [Citation.] [¶] . . . [A] claim that a law is unconstitutionally vague can succeed *only* where the litigant demonstrates, not that it affects a substantial number of others, but that the law is vague as to [him] or 'impermissibly vague in *all of its applications.*' [Citations.]" (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116.)

### a. The "Likely" Risk of Reoffending

Appellant contends that the SVPA is unconstitutionally vague because it fails to define the term "likely" in quantitative terms. We disagree. The meaning of "likely to engage in acts of sexual violence" was clearly explained by our Supreme Court in *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 894 (*Ghilotti*).

In *Ghilotti,* the court "conclude[d] that the phrase '*likely* to engage in acts of sexual violence' (italics added), as used in section 6601, subdivision (d), connotes much more than the mere possibility that the person will reoffend as a result of a predisposing mental disorder that seriously impairs volitional control. On the other hand, the statute does not require a precise determination that the chance of reoffense is *better than even*. Instead, an evaluator applying this standard must conclude that the person is '*likely* ' to reoffend if, *because of a current mental disorder which makes it difficult or impossible to restrain violent sexual behavior, the person presents a substantial danger, that is, a serious and well-founded risk, that he or she will commit such crimes if free in the community*." (*Id.* at p. 922, italics added.) Contrary to appellant's assertions, *Ghilotti's* clear definition of the phrase "likely to engage in acts of sexual violence" comports with due process requirements.

The term "likely" has been approved in statutes which are substantially similar to the SVPA, such as the Kansas law reviewed in *Kansas v. Hendricks*, *supra*, 521 U.S. 346. As noted in *Hubbart v. Superior Court, supra,* 19 Cal.4th at p. 1163, "The Kansas scheme applied to sex offenders who suffer from a mental disorder which impairs their ability to control sexually violent conduct and which ' " 'makes the person likely' " ' to engage in sexually violent crimes. [Citation.] The high court approved this statutory formula even though dangerousness was expressed in terms of a qualifying mental disorder giving rise to a likelihood of future criminal conduct." (*Ibid.*) Because the likelihood standard under the SVPA for predicting dangerousness is not materially different from the statutory formula at issue in *Hendricks,* we reject appellant's vagueness challenge.

### b. The Term "Mental Disorder"

Appellant next contends the SVPA is unconstitutionally vague because it fails to define the kind of mental disorder that may serve as a basis for a finding that an offender is likely to commit a sexually violent crime in the future. Defendant argues that as formulated, the SVPA would allow any mental disorder, including "eating disorders, stuttering, sleep terror disorder, separation anxiety, anxiety and phobic disorders

37

generally, kleptomania and pyromania" to serve as a basis for a finding that an offender is an SVP.

We cannot conclude that the SVPA is unconstitutionally vague as appellant contends. It defines a diagnosed mental disorder as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) This definition is reasonably certain. Indeed, our Supreme Court in *People v. Williams* (2003) 31 Cal.4th 757 (*Williams*) described the SVPA's definition of a diagnosed mental disorder as "clear language." (*Id.* at p. 774.) We see no merit to appellant's contention that the statute must spell out which conditions might give rise to this predisposition in order to pass constitutional muster. The statute spells out standards to allow the trier of fact to determine, with the aid of expert testimony, whether a defendant meets the standards to qualify as a sexually violent predator.

We are guided by our Supreme Court's admonition that "in this nuanced area, the *Legislature* is the primary arbiter of how the necessary mental-disorder component of its civil commitment scheme shall be defined and described." (*Williams, supra,* 31 Cal.4th at p. 774.) As in *Williams,* "[n]o reason appears to interfere with that legislative prerogative here." (*Ibid.*)

### 2. Equal Protection Clause

#### a. SVPA Commitment Scheme

Appellant contends his involuntary SVP commitment violates his federal constitutional right to equal protection because the SVPA treats him less favorably than similarly situated individuals committed under other statutes, such as mentally disordered offenders (MDO's) and criminal defendants sentenced to life in prison.

The claim of differential treatment focuses on the fact that SVP's are committed for an indeterminate term, with the burden placed on them to show they should be released after being committed, whereas MDO's are subject to time-limited commitments

in which the burden is on the People to prove that a recommitment is justified beyond a reasonable doubt.

The issues appellant raises have been decided against him by our Supreme Court in *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I* ), by this court, and by various other appellate courts (See *People v. McKee* (2012) 207 Cal.App.4th 1325, 1330-1331 (*McKee II*); *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1376-1382; *People v. Landau* (2013) 214 Cal.App.4th 1, 47-48; *People v. McKnight* (2012) 212 Cal.App.4th 860, 863-864.)  Appellant acknowledges that the appellate decisions uniformly have adopted and supported the conclusion reached in *McKee II*.  He argues nonetheless that this court should not accept the conclusions reached in *McKee II* because the court in *McKee II* failed to properly conduct a de novo review, failed to properly apply the strict scrutiny equal protection analysis, and the facts it relied upon did not justify the disparate treatment of SVP's.  We disagree with appellant and concur with the court's reasoning and holding in *McKee II*.  (*People v. McKnight, supra,* 212 Cal.App.4th at p. 864.)

Appellant also contends SVP's are treated unfavorably as compared to criminals sentenced to life in prison with the possibility of parole.  Appellant's claim fails because he has not shown SVP's are similarly situated to that class of criminals.  (See *McKee I, supra,* 47 Cal.4th at pp. 1202-1203.)

### b.  SVPA Release Provisions

Relying on *McCloud*, *supra*, 213 Cal.App.4th 1076, appellant argues that his case must be remanded for an evidentiary hearing as to whether the differences between the release provisions for SVP's and MDO's are justifiable.

Under section 6608, if an SVP files a petition for conditional release or unconditional discharge without the recommendation or concurrence of the Director of State Hospitals, the court "shall endeavor whenever possible to review the petition and determine if it is based upon frivolous grounds and, if so, shall deny the petition without a hearing." (§ 6608, subd. (a).)  In *McCloud, supra,* 213 Cal.App.4th 1076, the court held that the defendant's argument that this provision violates equal protection was not "wholly without merit" because "[t]here may well be actual disparate treatment of

39

similarly situated persons—and if there is disparate treatment, the state may or may not be justified in so distinguishing between persons." (*McCloud,* at p. 1088.) Accordingly, the court remanded the case to the trial court "so that both parties may fully brief and argue [defendant's] claim that section 6608, subdivision (a), violates the equal protection clause." (*Ibid.*)

The Attorney General argues that whatever the merit of the equal protection claim, remand is not appropriate in this case because appellant's appeal is from a decision made under the SVPA's initial commitment procedures (§§ 6601–6604), not from a determination under the postcommitment release procedure set forth in section 6608. We agree.

It is a "well-settled rule that courts should 'avoid advisory opinions on abstract propositions of law. [Citations.]' " (*People v. Ybarra* (1988) 206 Cal.App.3d 546, 549; *People v. Gonzales* (1994) 29 Cal.App.4th 1684, 1700.) To prevent advisory opinions, courts must wait until a case " 'has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' " (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 171.) Here, the record does not reflect any action taken by defendant pursuant to section 6608. As such, we find his equal protection challenge to section 6608 unripe.

### 3. *Ex Post Facto Clause*

Appellant acknowledges that *McKee I, supra,* 47 Cal.4th at pp. 1188-1195, rejected the ex post facto challenge he presently asserts, and that this court is bound by *McKee I.* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) The issues are raised, he states, solely to preserve his right to petition the California Supreme Court to change its ruling and to preserve his right to seek relief in the federal court. Therefore, no further discussion is necessary.

## IV. DISPOSITION

The commitment order is affirmed.

_____
REARDON, J.

We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.